No. 15-1858

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

**CORNWELL ENTERTAINMENT, INC., f/k/a CORNWELL
ENTERPRISES, INC., f/k/a CEI ENTERPRISES, INC.;
PATRICIA D. CORNWELL; STACI GRUBER, PH.D.**
Plaintiffs-Appellants,

v.

**ANCHIN, BLOCK & ANCHIN, LLP; EVAN SNAPPER**
Defendants-Appellees

On Appeal from a Final Judgment of the
United States District Court for the District of Massachusetts
Case No. 09-11708-GAO
The Hon. George A. O'Toole, Jr., U.S.D.J.

**BRIEF OF PLAINTIFFS-APPELLANTS**

Joan A. Lukey (1st Cir. Bar No. 14225)
Stuart M. Glass (1st Cir. Bar No. 64338)
Justin J. Wolosz (1st Cir. Bar No. 70575)
Kevin C. Quigley (1st Cir. Admission Pending)
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA 02110
Tel: (617) 248-5000
Fax: (617) 248-4000

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant

CEI Enterprises, Inc. hereby certifies that no parent company or publicly held

corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD .............................1

STATEMENT OF APPELLATE JURISDICTION ....................................1

ISSUES PRESENTED FOR REVIEW ......................................................2

STATEMENT OF THE CASE ...............................................................5

    A.    Factual Background .............................................................8

    B.    Defendants' Conduct, From Filing Through Trial ...........................10

    C.    The Post-Trial Ruling .......................................................10

    D.    Entry of Final Judgment ....................................................12

SUMMARY OF ARGUMENT ..............................................................12

STANDARD OF REVIEW ..................................................................16

ARGUMENT ..................................................................................17

I.    THE COURT ERRED IN ALLOWING DEFENDANTS' RULE
    50(B) MOTION WITH REGARD TO THE DOJ INVESTIGATION. .......17

    A.    Defendants Waived Any Affirmative Defense of Qualified
        Privilege .......................................................................19

    B.    The Court Erred By Making Predicate Findings Of Fact. .................22

    C.    Extensive Evidence Existed That Defendants True Motive
        Was Not a "Self-Report" ....................................................25

    D.    In Ruling That a Qualified Privilege Attaches To a
        Fiduciary's Purported "Self-Report", The Court Erred In
        Analogizing To a Defamation Case Involving No
        Fiduciaries. ...................................................................32

    E.    The Record Supports The Jury's Finding of Actual Malice. ..............35

    F.    The Court Erred In Permitting Defendants To Rely In Part
        On A Defense Of Advice Of Counsel With Regard to the

DOJ Investigation, While Refusing On the Basis of Attorney-Client Privilege To Permit Cross-Examination Regarding That Advice. .....................................................................37

II.    THE COURT ERRED IN REVERSING SEVERAL PRIOR RULINGS REGARDING THE STATUTE OF LIMITATIONS APPLICABLE TO THE BREACH OF FIDUCIARY DUTY COUNTS AND ALLOWING DEFENDANTS' RULE 50(**B**) MOTION WITH REGARD TO ALL DAMAGES INCURRED MORE THAN THREE YEARS BEFORE FILING OF THE LAWSUIT. ....................................................................41

       A.    The Court Erred in Refusing to Apply the Continuing Representation Doctrine. ..................................................42

       B.    The Court Erred In Ruling That A Three-Year, as Opposed to Six Year, Statute Of Limitations Applied. ....................46

III.   IF THIS COURT REVERSES WITH REGARD TO THE DOJ INVESTIGATION AND THE APPLICABLE STATUTE OF LIMITATIONS, THE VERDICTS SHOULD BE REINSTATED WITHOUT A RETRIAL. ..............................................49

       A.    The NetJets Damages Should Be Reinstated, Or Simply Remitted. ............................................................49

       B.    If this Court Reverses with Regard to Either the DOJ Issue or the Statute of Limitations, But Not Both, the Remaining Issues Should be Reinstated for Retrial and Discovery Should Be Granted on the Sidley Austin Recusal Motion. ................51

             1.    Because Proceeding to Retrial on the Claims Remaining After the FRCP 50(b) Decision Was Not Feasible Before This Appeal, Those Claims Should Be Added to Any Retrial Post Appeal. ....................51

             2.    Plaintiffs' Recusal Motion Should Be Reinstated So That Discovery Can Proceed. ..................................54

IV.    THE COURT ERRED IN REFUSING TO AWARD EQUITABLE FORFEITURE IN LIGHT OF THE SPECIAL VERDICT REGARDING DEFENDANTS' CONDUCT. .............................................56

V.  THE COURT ERRED IN RULING AS A MATTER OF LAW THAT
PLAINTIFFS WERE NOT ENTITLED TO DAMAGES, IN THE
FORM OF REASONABLE ATTORNEYS' FEES AND COSTS,
UNDER MASSACHUSETTS GENERAL LAWS CHAPTER 93A. .......... 59

    A.  The Court Erred in Ruling That Massachusetts Statutory
Law Cannot Apply In Conjunction with New York Common
Law. ................................................................................................ 59

    B.  The Court Erred In Ruling That Choice Of Law Principles
Required Application of New York Consumer Protection
Law. ................................................................................................ 60

VI.  THE COURT ERRED IN ITS POST-TRIAL INTEREST
COMPUTATIONS. ...................................................................................... 62

CONCLUSION ...................................................................................................... 64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Action S.A. v. Marc Rich & Co., Inc.*,
    951 F.2d 504 (2d Cir. 1991) ................................................................62

*American Re-Insurance Co. v. United States Fid. and Guar. Co.*,
    40 A.D.3d 486 (N.Y. App. Div. 2007) ..............................................38

*Astra, Inc. v. Bildman*,
    455 Mass. 116 (2009) ........................................................56, 57, 58

*Baker v. Goldman*,
    771 F.3d 37 (1st Cir. 2014) ..............................................................17

*Beacon Theatres v. Westover*,
    359 U.S. 503 (1959) .................................................................5, 15, 57

*Blockel v. J.C. Penney Co.*,
    337 F.3d 17 (1st Cir. 2009) ..............................................................17

*Bushkin Assocs., Inc. v. Raytheon Co.*,
    473 N.E.2d 662 (Mass. 1985) ..........................................................60

*Cash v. County of Erie*,
    654 F.3d 324 (2d Cir. 2011) ............................................................31

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000) ............................................................36

*Chrabaszcz v. Johnson Sch. Comm. et al.*,
    No. 03-133S, 2007 U.S. Dist. LEXIS 2846 (D.R.I. Jan. 12, 2007) ....22

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
    762 N.E.2d 303 (Mass. 2002) ..........................................................61

*Command Transp., Inc. v. Y.S. Line (USA) Corp.*,
    116 F.R.D. 94 (D. Mass. 1987) ........................................................39

*Correa v. Hospital San Francisco*,
  69 F.3d 1184 (1st Cir. 1995)..............................................................22

*Crowe* v. *Bolduc*,
  365 F.3d 86 (1st Cir. 2004)..............................................................61

*Demas v. Levitskey*,
  738 N.Y.S.2d 402 (N.Y. App. Div. 2002)..........................................20

*Don Buchwald & Assocs. v. Rich*,
  281 A.D.2d 329 (N.Y. App. Div. 2001) ............................................19

*Feiger v. Iral Jewelry, Ltd.*,
  41 N.Y.2d 928 (N.Y. 1977) ..............................................................56

*First Sec. Bank, N.A. v. Nw. Airlines, Inc.*,
  No. 95-12103, 2001 U.S. Dist. LEXIS 26601 (D. Mass. Jan. 3, 2001) ............59

*Fishman Transducers, Inc. v. Paul*,
  No. 07-10071-GAO, 2011 U.S. Dist. LEXIS 32749
  (D. Mass. Mar. 29, 2011)..................................................................57

*Fox v. Koplik*,
  No. 12-6784, 2013 U.S. Dist. LEXIS 123254 (Aug. 14, 2013) ........................62

*Frank Mgmt., Inc. v. Weber*,
  549 N.Y.S. 2d 317 (N.Y. Sup. Ct. 1989).......................................44, 47

*Gayle Martz, Inc. v. Sherpa Pet Group, LLC*,
  651 F. Supp. 2d 72 (S.D.N.Y. 2009) .................................................33

*Gibbs* v. *Breed, Abbott & Morgan*,
  693 N.Y.S.2d 426 (N.Y. Sup. Ct. 1999), *rev'd on other grounds*,
  710 N.Y.S.2d 578 (N.Y. App. Div. 2000).........................................63

*Goldberg v. Hirschberg*,
  10 Misc. 3d 292 (N.Y. Sup. Ct. 2005)...........................................39, 40

*Golden Pac. Bancorp v. F.D.I.C.*,
  273 F.3d 509 (2d Cir 2001) .........................................................44, 45

*IDT Corp. v. Morgan Stanley Dean Witter & Co.*,
  907 N.E.2d 268 (N.Y. 2009)........................................................46, 48

*Ironshore Ins. Ltd. v. W. Asset Mgmt. Co.*,
    No. 11-05954, 2012 U.S. Dist. LEXIS 76818 (S.D.N.Y. May 30, 2012)..........48

*James v. Price Stern Sloan*,
    283 F.3d 1064 (9th Cir. 2002) ...........................................................................53

*Kelley v. Riccelli Enters. of Mass., Inc.*,
    No. 10-P-1796, 2011 Mass. App. LEXIS 1272
    (Mass. App. Ct. Oct. 11, 2011).........................................................................59

*Lia v. Saporito*,
    541 F. App'x 71 (2d Cir. 2013) .........................................................................48

*In re Lloyd's Am. Trust Fund Litig.*,
    2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002)..................................47

*Lluberes v. Uncommon Prods., LLC*,
    663 F.3d 6 (1st Cir. 2011)..................................................................................16

*Lucente* v. *Int'l Bus. Machines Corp.*,
    151 F. Supp. 2d 484 (S.D.N.Y. 2001), *rev'd on other grounds*,
    310 F.3d 243 (2d Cir. 2002) ..............................................................................62

*Malmsteen v. Berdon, LLP*,
    369 F. App'x 248 (2d Cir. 2010) ..................................................................47, 48

*Malone v. Lockheed Martin Corp.*,
    610 F.3d 16 (1st Cir. 2010)................................................................................16

*Marchig v. Christies Inc.*,
    430 F. App'x 22 (2d Cir. 2011) .........................................................................44

*Marshall v. Milberg LLP*,
    No. 07-6950, 2009 U.S. Dist. LEXIS 121208 (S.D.N.Y. Dec. 23, 2009)....44, 45

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
    552 F.3d 47 (1st Cir. 2009)...........................................................................16, 50

*Monteagudo v. Asosiación de Empleados del Estado Libre Asociado de P.R.*,
    554 F.3d 164 (1st Cir. 2009)..............................................................................16

*Morante v. American Gen. Fin. Ctr.*,
    157 F.3d 1006 (5th Cir. 1998) ...........................................................................20

*Munoz v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.*,
  671 F.3d 49 (1st Cir. 2012).................................................................21

*New Eng. Ins. Co.* v. *Healthcare Underwriters Mut. Ins. Co.*,
  352 F.3d 599 (2d Cir. 2003) .............................................................62

*New Testament Missionary Fellowship v. E.P. Dutton & Co., Inc.*,
  491 N.Y.S.2d 626 (N.Y. App. Div. 1985)...........................................36

*Osorio v. One World Techs, Inc.*,
  659 F.3d 81 (1st Cir. 2011)...........................................................21, 22

*Perdoni Bros., Inc. v. Concrete Systems, Inc.*,
  35 F.3d 1 (1st Cir. 1995)....................................................................22

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  230 F.R.D. 61 (D. Mass. 2005)..........................................................61

*Putnam Res. v. Pateman*,
  958 F.2d 448 (1st Cir. 1992).............................................................59

*Reicher v. Berkshire Life Ins. Co. of Am.*,
  360 F.3d 1 (1st Cir. 2004)..................................................................60

*Rodriguez v. Cent. Parking Sys. of New York, Inc.*,
  17 Misc. 3d 108, 848 N.Y.S.2d 807 (N.Y. Sup. Ct. 2007).................47

*Scott v. Fields*,
  925 N.Y.S.2d 135 (N.Y. App. Div. 2011).........................................46

*Scott v. Young Life*,
  710 N.Y.S.2d 279 (N.Y. App. Div. 2000).........................................20

*Skyline Steel, LLC v. Pilepro, LLC*,
  2015 U.S. Dist. LEXIS 95929 (S.D.N.Y. July 22, 2015)..............39, 40

*Speedfit LLC v. Woodway United States*,
  53 F. Supp. 3d 561 (E.D.N.Y. 2014) ...............................................48

*St. John's Univ. v. Bolton*,
  757 F. Supp. 2d 144 (E.D.N.Y. 2010) .............................................44

*States Police Benev. Assoc., Inc. v. First Choice Armor & Equip., Inc.*,
    241 F.R.D. 85 (D. Mass. 2007) ..........................................................60

*Symbol Techs., Inc. v. Deloitte & Touche, LLP*,
    888 N.Y.S.2d 538 (N.Y. App. Div. 2009) ........................................43

*Toker v. Pollak*,
    376 N.E.2d 163 (N.Y. 1978) ....................................................*passim*

*Toker v. Pollak*,
    44 N.Y.2d 211 (N.Y. 1978) ..............................................................32

*Troy v. Bay State Computer Grp.*,
    141 F.3d 378 (1st Cir. 1998) ...........................................................15

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ..........................................................40

*United States v. Danielczyk*,
    788 F. Supp. 2d 472 (E.D. Va. 2011), *overruled on other grounds*,
    683 F.3d 611 (4th Cir. 2012) ...........................................................26

*Jones ex rel. United States v. Mass. Gen. Hosp.*,
    780 F.3d 479 (1st Cir. 2015) ............................................................21

*Value Partners S.A. v. Bain & Co.*,
    245 F. Supp. 2d 269 (D. Mass. 2003) ..........................................59, 60

*Visible Sys. Corp. v. Unisys Corp.*,
    551 F.3d 65 (1st Cir. 2008) ..............................................................17

*In re von Bulow*,
    828 F.2d 94 (2d Cir. 1987) ..............................................................39

*Westchester Religious Inst. v. Kamerman*,
    691 N.Y.S.2d 502 (N.Y. App. Div. 1999) ........................................44

*Williamson v. PricewaterhouseCoopers, LLP*,
    872 N.E.2d 842 (N.Y. 2007) ......................................................43, 45

*Wilson v. Erra*,
    94 A.D.3d 756 (N.Y. App. Div. 2012) ..............................................11

*Zaidi v. United Bank Ltd.*,
    194 Misc. 2d 1 (N.Y. Sup. Ct., May 2, 2002) ...........................................18, 35

*Zeevi v. Union Bank of Switzerland*,
    No. 89-Civ-4637, 1993 WL 148871 (S.D.N.Y. April 30, 1993).......................20

*Zimmerman v. Direct Fed. Credit Union*,
    262 F.3d 70 (1st Cir. 2001) ........................................................................31

*Zorn v. Gilbert*,
    8 N.Y.3d 933 (N.Y. 2007) ...........................................................................43

**Statutes**

2 U.S.C.S. § 441f ...............................................................................................26

28 U.S.C. § 1291 ................................................................................................2

28 U.S.C. § 1292(b) .....................................................................................12, 51

28 U.S.C. § 1332 ................................................................................................1

28 U.S.C. § 1961 ...............................................................................................63

C.P.L.R. § 5001(a) .................................................................................61, 62, 63

C.P.L.R. § 5002 .................................................................................................63

M.G.L. c. 93A .............................................................................................*passim*

M.G.L. c. 93A, § 9 ..............................................................................................5

**Rules**

Fed. R. App. P. 37(b) .........................................................................................61

Fed. R. Civ. P. 54(b) ....................................................................................51, 52

Fed. R. Civ. P. 6(e).............................................................................................54

Fed. R. Civ. P. 50(a)..........................................................................2, 18, 20, 21

Fed. R. Civ. P. 50(b) ...................................................................................*passim*

Fed. R. Civ. P. 54 ..............................................................................................12

Fed. R. Civ. P. 59 ............................................................6, 12, 48

Fed. R. Evid. 501 ...................................................................39

Mass. R. Prof. C. 1.1 .............................................................54

**Treatises**

Restatement (Second) Conflict of Laws sec. 6 ...............................60, 61

14 N.Y. Practice, New York Law of Torts Sec. 1:51 (2013) ...................20

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Petitioners-Appellants request that the Court hear oral argument. This appeal contains legal questions of first impression with regard to the District Court's post-verdict decision to apply a qualified privilege, analogized to defamation law and raised for the first time post-verdict, to a claim for breach of fiduciary duty. This appeal also raises novel questions as to whether a trial court is permitted to make predicate factual findings to support a privilege claim, particularly where such predicate findings are contrary to the findings of the jury. Moreover, the record following this six-week jury trial is dense and complicated, and oral argument will likely assist the Court in assimilating that record.

## STATEMENT OF APPELLATE JURISDICTION

Jurisdiction vested in the District Court under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs.

After a six-week trial, the jury returned verdicts for Plaintiffs on February 19, 2013. On March 25, 2014, the District Court granted in part Defendants' FRCP 50(b) motion for judgment as a matter of law dismissing Plaintiffs' major claims, and granted Defendants' motion for a new trial with regard to the few remaining smaller damage claims. Plaintiffs declined to offer additional evidence relating to the latter, and requested entry of final judgment to permit this appeal to

- 1 -

proceed forthwith.  The District Court agreed and entered final judgment for Defendants on July 13, 2015.  This appeal was filed on July 24, 2015.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.    In a breach of fiduciary duty case rife with factual disputes, whether the trial court violated Plaintiffs' Seventh Amendment rights by vacating the jury's verdicts in favor of Plaintiffs and entering judgment in Defendants' favor pursuant to FRCP 50(b), on a claim where the jury found that Defendants had "intentional[ly], deliberate[ly]…under aggravating or outrageous circumstances, and/or [in] willful[] or wanton[] disregard[] for Plaintiffs' rights" initiated a criminal investigation by the Department of Justice[1] of Plaintiff Cornwell for a crime that she did not commit.

A.    Whether the trial court erred in adopting Defendants' post-trial contention that a qualified privilege attached to their conduct in initiating the DOJ Investigation, where any such privilege had been waived by failure to raise it at any earlier point, including their FRCP 50(a) motion.

B.    Whether the trial court erred in adopting Defendants' post-trial qualified privilege defense, where that ruling required the court to override

---

[1]  Hereafter, the "DOJ Investigation."

- 2 -

the jury by making a predicate finding of disputed fact that Defendants

initiated the DOJ Investigation as a "self-report" of their own conduct.

      C.     Whether the trial court erred in applying defamation law

regarding false accusations of criminal conduct to a breach of fiduciary duty

claim, particularly post-trial when it was too late for Plaintiffs to address the

burden-shifting unique to defamation law.

      D.     In circumstances where a finding of actual malice would defeat

Defendants' belated assertion of qualified privilege, and where the jury

made such a finding as a predicate to their punitive damage award, whether

the trial court erred in rejecting the jury's finding of malice, disregarding

extensive direct and circumstantial evidence of malice, and ruling as a

matter of law that no "reasonable jury" could find malice.

      E.     In circumstances where Defendants repeatedly testified that

they relied on advice of counsel to justify their decision to initiate the DOJ

Investigation, and where the court relied on that advice of counsel defense as

one basis for ruling that Plaintiffs had not proven malice as a matter of law,

whether the trial court erred in blocking Plaintiffs' repeated attempts to

inquire of Defendants regarding such conversations.

      2.     In circumstances where the trial court acknowledged that New York

law was not "pellucid," whether the court erred post trial in reversing its own

rulings on five earlier occasions concerning the statute of limitations applicable to Plaintiffs' breach of fiduciary duty claims and allowing Defendants' FRCP 50(b) motion with regard to all damages incurred more than three years before the filing of the lawsuit, notwithstanding the ongoing fiduciary relationship until seven weeks pre-filing.

       A.      Whether the trial court erred in ruling post-trial that the limitations period was not tolled during the ongoing fiduciary relationship.

       B.      Whether the trial court erred in ruling post-trial that the statute of limitations for breach of fiduciary duty under New York law depended exclusively on the substantive remedy sought by Plaintiffs, and not on the existence of a contractual relationship from which the fiduciary duty arises.

       C.      Whether the trial court erred in ruling that one element of the damages flowing from Defendants' failure to meet its ongoing obligation to ensure that Cornwell had appropriate writing locales, to wit, a multi-million dollar missed book deadline, was time-barred even though the real estate management duty that was breached was on-going through the end of the fiduciary relationship.

3.      Whether, if this Court reverses the trial court's post-trial rulings concerning the DOJ Investigation and the statute of limitations, the jury verdicts in totality should be reinstated without a retrial.

4. Whether the trial court erred in refusing to award equitable forfeiture of the fees paid by Plaintiffs to Defendants, where the jury reached the verdicts constituting the necessary predicate for such an award, and the court's refusal to order disgorgement violated the *Beacon Theatres* doctrine and Plaintiffs' Seventh Amendment rights.

5. Whether the trial court erred in ruling that Plaintiffs were not entitled to M.G.L. c. 93A, § 9 damages, including reasonable attorneys' fees and costs, by inappropriately applying choice of law grounds favoring the locus of the service provider over that of the injured consumers.

6. Whether the trial court erred in its post-trial interest computations.

## STATEMENT OF THE CASE

After twenty-six days of trial in January and February of 2013 (JA 44-51), during which the jury heard from twenty-three witnesses[2] and were exposed to 543 exhibits and chalks, the jurors returned verdicts in favor of author Patricia Cornwell, her S-corporation, and her neuroscientist spouse Staci Gruber, Ph.D (collectively "Plaintiffs") and against their concierge business managers on all submitted counts.[3] JA 1788-92. Compensatory verdicts totaled $28,562,400. *Id.*

---

[2] Fifteen witnesses testified live, and eight others by video or transcript excerpts. Tr. trans. passim.

[3] Plaintiffs' claims submitted to the jury were breach of fiduciary duty, professional negligence, and breach of contract. Defendants' counterclaims sounded in contract. JA 1788-92.

The jury also found under New York law that Defendants' breach of fiduciary duty was "intentional or deliberate, occurred under aggravating or outrageous circumstances, and/or willfully or wantonly disregarded the Plaintiffs' rights," and awarded punitive damages.[4]  JA 1790.

Three months post-trial, in the context of denying the equitable forfeiture count for disgorgement of fees paid to Defendants, the Judge signaled his apparent intention to leave the verdicts intact.  He wrote, "in light of the jury's punitive damage award, as well as the size of the compensatory award, *I would not regard it as equitable to make an additional disgorgement order*" (emphasis added).  JA 4643-44; ADD-18-19.

But, thirteen months post-trial, in the context of ruling upon Defendants' Rule 50(b) Motion for Judgment as a Matter of Law and Rule 59 Motion for a New Trial, the Judge reversed himself with regard to whether he had properly permitted the jury to consider the DOJ Investigation, and with regard to the statute of limitations for breach of an on-going fiduciary relationship.  In a terse nine and a half page Order, citing little supporting authority, the Judge dismissed as a matter

---

[4]  Defendants filed motions under seal relating to the $22,405,400 punitive damage award (JA 1790), which were denied by the District Court after sealed proceedings.  Dkt. Nos. 342, 344, 349.  No appeal was taken from the denial of those motions.  For reasons that are not at all clear under that circumstance, Defendants have designated various documents from the sealed proceedings for inclusion in the Record, necessitating the filing of a separate sealed Appendix.  Plaintiffs object but will file the Sealed Appendix as requested.

of law[5] all claims relating to the DOJ Investigation, and excluded damages arising from any events occurring more than three years before the filing of this lawsuit. On the basis that the newly excluded claims may have affected the jury's consideration of other claims, the court ordered a retrial on the handful of remaining smaller dollar claims.  JA 4779-4789; ADD-1-12.

The trial court's instructions to the jury at trial were fully in accord with the law, and the verdicts as returned by the jury were amply supported by the evidence.  The court's change of heart cannot be justified on the basis of either the evidentiary record or the law.

Plaintiffs elected not to offer further evidence on the minimal remaining counts, both on economic grounds and because a key figure in their claims, former Deputy Attorney General James Cole,[6] had become a partner in the law firm retained by Defendants to handle the appeal.  JA 5837-5862.  At Plaintiffs' request

---

[5]  As explained below, Plaintiff Cornwell's two largest claims were (a) that, within weeks of the filing of her original Complaint, Defendants initiated the DOJ Investigation, falsely accusing her of directing an Anchin principal to commit a campaign contribution felony, and (b) that Defendants' mismanagement of her real estate caused her to miss an annual book deadline.  In the first instance, the Court's post-trial ruling dismissing the claim as a matter of law was predicated upon judicial fact finding that contravened the jury's findings on the same issues.  *See* § I.B, *infra*.  In the second instance, the judge, noting that New York law was not fully "pellucid," reversed at least five prior rulings on precisely the same statute of limitations issue.  *See* § II, *infra*.

[6]  *See* § III.B, *infra*.

(JA 6215-17), the Court entered final judgment on July 13, 2015 in order to allow this appeal to proceed (JA 5942).

### A.     Factual Background

For almost five years, beginning in January 2005 when Yohalem Gillman LLP merged with or was acquired by Anchin Block & Anchin LLP ("Anchin"), Anchin served as "concierge business managers"[7] for best-selling author Patricia Cornwell ("Cornwell") and her S-Corporation Cornwell Entertainment, Inc. ("CEI"), and, for the latter part of that period, for her spouse Dr. Staci Gruber ("Gruber") as well.  JA 7528-29.  Defendant Evan Snapper ("Snapper") (collectively with Anchin, "Defendants") acted as relationship principal for most of that period.  JA 6629, 7506.  Defendants' responsibilities to Plaintiffs included managing and controlling their money (JA 6371-75; 7493; 7570), overseeing their investments (JA 6347-48; 8087-88), handling "every aspect" of their real estate needs (JA 6404; 6489-90), advising regarding political contributions (JA 8148-49), and, as to Cornwell, holding broad powers of attorney to perform these roles without involving her directly.  JA 7402-03.  With regard to CEI, of which he was

---

[7]  This was described by both Plaintiffs and Defendants as "do[ing] anything and everything" requested by a client (JA 6549, 8535-36), similar to the functions provided by a family office and more extensive than those typically provided by an accounting firm.  JA 7528-29.  Anchin Managing Partner Frank Schettino ("Schettino") explained that concierge business management handles every aspect of a person's world, as required, and that the Anchin website for its Business Management Unit (the former Yohalem Gillman LLP) describes itself as such.  JA 7226.

the Treasurer, Snapper conducted himself as if he were the principal. JA 8089; 6396-98. He considered his role to be that of "the quarterback" who "controlled, advised and worked with a lot of different players." JA 7640.

The relationship began to fray toward the mid-point of Anchin's tenure, relating in part to Defendants' failure to provide copies of the invoices that Anchin had been paying itself from Plaintiffs' funds for the past two and a half years and in part to the residential real estate debacle that left Cornwell without an appropriate locus to write. (JA 6503-06, 6512-14; 6541-42).

Plaintiffs terminated the relationship in the summer of 2009, after learning that Cornwell's net worth had stagnated under Anchin's direction, despite her substantial revenue generation during those years. JA 6654. Following termination, and after reviewing 103 disorganized boxes returned by Anchin containing Plaintiffs' financial and transactional documents (JA 6563-65), Cornwell and Gruber were unable to determine the disposition of a significant portion of Cornwell's funds. JA 6637-54. A lawsuit ensued in mid-October 2009, seven weeks after Plaintiffs terminated Defendants' services. JA 14. As a result of events described below in the period immediately after the commencement of the litigation, the Complaint was subsequently expanded to include a claim of breach of fiduciary duty relating to Defendants' conduct post-filing. JA 98, 110-111.

### B.     Defendants' Conduct, From Filing Through Trial

The DOJ Investigation was a centerpiece of the trial.  In her Closing,

Plaintiffs' counsel argued:

"…[T]here is no question that Anchin went to the Department of Justice and

blamed Ms. Cornwell for the election reimbursement scheme, as it was called" (JA

8720);

"…[T]hey simply went to the Department of Justice with a highly placed

lawyer who because the deputy attorney general during the course of the

investigation, and they said, 'it's Ms. Cornwell's fault,' and they laid her out on a

silver platter."  JA 8721.

"We ask you to make a determination as to what it would take to punish a

company whose executives decide that it's the right thing to do to blame a client

for something that they know full well she had no idea was criminal conduct."  JA

8722-23.

### C.     The Post-Trial Ruling

Post-trial, Defendants retained a new law firm, Sidley Austin, LLP

("Sidley"), to replace lead trial counsel.  Sidley promptly filed a Motion for

Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure

("FRCP") 50(b), in which they raised an affirmative defense of qualified privilege[8] that had never previously been asserted.[9]  The cases upon which they relied, *Toker v. Pollak*, 376 N.E.2d 163, 166 (N.Y. 1978) and *Wilson v. Erra*, 94 A.D.3d 756, 757 (N.Y. App. Div. 2012), were defamation cases, where principles of privilege and malice are well-established.  The trial court erred thirteen months post-trial in granting Defendants FRCP 50(b) motion on the basis of the newly asserted qualified privilege defense.  JA 4785-86; ADD-8-9.

In the same post-trial Order, the District Court reversed course with regard to at least five earlier rulings[10] regarding the statute of limitations applicable to breach of fiduciary duty claims under New York law.  JA 4782-83; ADD-5-6.  After "reconsideration," the Court concluded that its "instruction regarding the limitation period was erroneous," even though "New York law is not pellucid on this point".  *Id*.  The appropriate statute of limitations for the breach of fiduciary duty claim was, the Court belatedly decided, three years, rather than either treating

---

[8]  Defendants also asserted an absolute privilege in connection with the production of materials pursuant to a DOJ subpoena (JA 4664), but the response to the subpoena has never been the basis for Plaintiffs' breach of fiduciary duty claim.  *See* JA 111 at ¶ 34 (a)-(b) and JA 120 at ¶41(c).

[9]  Specifically, Defendants contended that their "disclosures prior to the subpoena are qualifiedly privileged and thus cannot be the basis for civil liability absent evidence– wholly lacking here– that defendants made knowingly false statements, acted with reckless disregard for the truth, or were motivated solely by spite."  JA 4664.

[10]  *See* n. 35, *infra*.

the statute as tolled for the period of the fiduciary relationship, or applying a six

year statute because the fiduciary relationship was contractual in nature. *Id.* The

Court was correct the first five times, and in error the last.

### D. Entry of Final Judgment

Plaintiffs' efforts to obtain a separate FRCP 54 final judgment, or

certification of the legal questions pursuant to 28 U.S.C. § 1292(b) (JA 4790-

4801), were unsuccessful. JA 4886. However, in advance of the scheduled retrial

of the minimal claims that survived the Court's FRCP 50(b) and FRCP 59 Orders,

the Court agreed with Plaintiffs that the Rule 50(b) and c. 93A judgments were

already fully preserved for appeal and that those claims would not be the subject of

any retrial. JA 6211-12. The Court then accepted Plaintiffs' statement that they

would offer no further evidence on the minimal remaining counts (JA 6201, 6217),

and entered final judgment on all counts.[11] JA 5942. This appeal promptly

followed. JA 5943-44.

### SUMMARY OF ARGUMENT

The trial court violated Plaintiffs' Seventh Amendment rights and erred as a

matter of law by allowing Defendants' FRCP 50(b) motion with regard to the DOJ

---

[11] Plaintiffs provided two reasons for their request: First, they explained that they did not wish to proceed to a retrial with Sidley involved because James Cole had recently joined that firm as a partner, and Plaintiffs believed it created an information imbalance regarding the DOJ Investigation. JA 6203-08. Second, they explained that the economics of the remaining claims measured against the probable length and the cost of the trial militated against proceeding. JA 6212-14.

Investigation.  The court ruled that Defendants were cloaked in a qualified

privilege and that Plaintiffs failed to override that privilege by proving that

Defendants acted with actual malice.  If such a qualified privilege existed in a

breach of fiduciary duty context, which it did not, that defense was waived by

Defendants' failure to raise it before the FRCP 50(b) stage.  Even if the privilege

had not been waived, which it was, the court arrived at its ruling by usurping the

jury's fact finding role in at least two respects:  First, Defendants claimed that they

initiated the DOJ Investigation as a "self-report," while Plaintiffs claimed they did

so as a vehicle to accuse Cornwell falsely of directing the commission of a crime.

The jury resolved the factual dispute in Plaintiffs' favor, and the trial court

substituted its own finding favoring Defendants.  Further, the court itself lessened

the motivation evidence by repeatedly excluding all inquiries into Defendants'

communications with their counsel, even after Defendants relied on advice of

counsel and volunteered selected pieces of that advice.  Secondly, the trial court

ruled as a matter of law that Plaintiffs failed to adduce sufficient evidence from

which a "reasonable jury" could find actual malice, and therefore erroneously

rejected the jury's well-supported finding of actual malice.  *See pp.* 17-40, *infra.*

The trial court erred as a matter of law in allowing Defendants' FRCP 50(b)

motion with regard to the statute of limitations applicable to Plaintiffs' breach of

fiduciary duty claims.  On at least five prior occasions before and during trial, the

court rejected Defendants' contention that a three year statute of limitations should be applied and should be separately triggered by each event alleged to have caused damage.  On each of those prior occasions, the court accepted Plaintiffs' contention that the limitation period was tolled for the duration of the fiduciary relationship because Defendants' real estate management responsibilities were ongoing, or, alternatively, that a six year statute of limitations was applicable because Defendants' fiduciary relationship was contract-based.  The court was correct the first five times, and wrong as a matter of law the sixth.  *See pp.* 40-48, *infra*.

If this Court reverses the trial court's FRCP 50(b) findings and rulings regarding the DOJ Investigation and the statute of limitations, the jury verdicts should be reinstated in their totality.  The only other claim dismissed by the court in its FRCP 50(b) rulings was that of the losses on Plaintiffs' NetJets aviation contracts in the amount of $532,000.  Plaintiffs offered sufficient evidence for a reasonable jury to award those damages; but, even if a court were to differ on that point, the appropriate remedy in the context of compensatory verdicts in excess of $24 million is simply to remit that amount.  Ordering a retrial because of the isolated NetJets issue is a waste of the courts' and the parties' resources.  In addition, because Plaintiffs declined under economic and other pressures to offer additional evidence regarding the surviving claims pending review by this Court of

the trial court's FRCP 50(b) rulings, the verdicts should be reinstated with regard to those claims as well as to the dismissed claims. *See pp.* 48-55, *infra*.

The Court erred in refusing to award equitable forfeiture in light of the special verdicts finding that Defendants' breached their fiduciary duties to Plaintiffs, and did so in a reprehensible manner. Plaintiffs proffered substantial evidence that the period of disloyalty spanned the entire period of the contractual/fiduciary relationship, and Defendants offered no evidence of a shorter period. The court was prohibited under the *Beacon Theatres* doctrine from simply disregarding the jury's findings. *See Beacon Theatres v. Westover*, 359 U.S. 503-504 (1959); *Troy v. Bay State Computer Grp.*, 141 F.3d 378, 382-83 (1st Cir. 1998). *See pp.* 55-58, *infra*.

The trial court erred in ruling as a matter of law that Plaintiffs were not entitled to M.G.L. c. 93A damages in the form of attorneys' fees and costs. No prohibition exists on applying a Massachusetts remedial consumer protection statute to protect Massachusetts consumers, while applying New York common law to assess the conduct of New York service providers. In addition, choice of law principles favored application of the Massachusetts remedial statute over the New York consumer protection statute because the injured consumers are Massachusetts residents. *See pp.* 58-63, *infra*.

- 15 -

## STANDARD OF REVIEW

This Court reviews a district court's grant of a Rule 50(b) motion *de novo*. *Malone v. Lockheed Martin Corp.*, 610 F.3d 16, 19 (1st Cir. 2010). Indeed, "a jury's verdict and factual findings '*must* be upheld unless the facts and inferences *viewed in the light most favorable to the verdict* point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict.'" *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009) (internal citations and quotations omitted) (emphasis added); *see also Monteagudo v. Asosiación de Empleados del Estado Libre Asociado de P.R.*, 554 F.3d 164, 170 (1st Cir. 2009) ("[A] party seeking to overturn a jury verdict faces an uphill battle and … review is weighted toward preservation of the jury verdict.") (internal citations and quotations omitted). A court must not evaluate either the credibility of the witnesses or the weight of the evidence. *Malone*, 610 F.3d at 20.

The conclusions of law underlying the trial court's grant of the FRCP 50(b) motion are also reviewed *de novo*. The district court's refusal, on privilege grounds, to permit cross-examination of Defendants' advice-of-counsel defense with regard to a determination of good faith versus malice is reviewed for abuse of discretion. *Lluberes v. Uncommon Prods., LLC*, 663 F.3d 6, 23 (1st Cir. 2011).

- 16 -

The district court's refusal to award equitable forfeiture on sufficiency-of-the-evidence grounds, as well as its denial of M.G.L. c. 93A damages on choice-of-law grounds, are each reviewed *de novo*. *Baker v. Goldman*, 771 F.3d 37, 49 (1st Cir. 2014) (as to M.G.L. c. 93A); *Visible Sys. Corp. v. Unisys Corp.*, 551 F.3d 65, 79 (1st Cir. 2008) (as to sufficiency of the evidence). So, too, are its post-trial interest computations, which are a matter of statutory interpretation. *See Blockel v. J.C. Penney Co.*, 337 F.3d 17, 29 (1st Cir. 2009).

## ARGUMENT

## I.    THE COURT ERRED IN ALLOWING DEFENDANTS' RULE 50(B) MOTION WITH REGARD TO THE DOJ INVESTIGATION.

A principal focus of Plaintiffs' breach of fiduciary duty claim was their allegation that Defendants falsely accused Cornwell of directing the commission of a campaign contribution felony. JA 110-11 at ¶ 34 (a)-(b); JA 120 at ¶ 41(c). Further, this was the *only* basis on which Plaintiffs asked the jury in her Closing to award punitive damages. JA 8721-23. Hence, when the jury found that Defendants' breaches of fiduciary duty were "intentional or deliberate, occurred under aggravating or outrageous circumstances, and/or willfully or wantonly disregarded the Plaintiffs' rights"[12] (JA 1790), they clearly rejected Defendants'

---

[12] This was the predicate question for the award of punitive damages, which followed in the next Special Verdict. JA 1790. That standard, and the finding that the jury made pursuant to that standard, meets the New York definition of malice.

contention that they were merely "self-reporting" their own conduct (*see, e.g.*, JA 8671), and accepted Plaintiffs' contention of an ill-motivated false accusation.[13]

The trial court was aware before trial of the parties' factual dispute regarding the motive behind initiation of the DOJ Investigation (*see, e.g.*, JA 1701), beginning with Defendants' motion in *limine* to preclude evidence concerning same. (JA 1712). At the close of the evidence, during which Plaintiffs provided extensive testimony and documentary evidence of the true genesis of the DOJ Investigation, *see* § I.B, *infra*, the court denied Defendants' FRCP 50(a) motion, which was based on the general premise that "the act of reporting … could not have constituted a breach of fiduciary duty" (JA 1735).

Thirteen months post-verdict, the trial court entered judgment as a matter of law in favor of Defendants on Plaintiffs' claims relating to the DOJ Investigation. The court did so by making a predicate finding of fact that Defendants had "self-reported." On the basis of that finding, the court held that the "self-report" was cloaked in a qualified privilege that Plaintiffs failed to overcome by proving actual malice. JA 4785-4786; ADD-7-8. As discussed below, the Court erred on multiple grounds – including the waiver of the unasserted privilege claim, the

---

*See, e.g.*, *Zaidi v. United Bank Ltd.*, 194 Misc. 2d 1, 9 (N.Y. Sup. Ct., May 2, 2002) (defining malice under New York law).

[13] The size of the compensatory fiduciary duty verdict, in excess of $22 million, also permits and perhaps compels this inference.

rejection of the jury's amply supported finding regarding Defendants' motivation, and the rejection on sufficiency of the evidence grounds of the jury's well-supported finding that Defendants acted maliciously. In so doing, the court spurned the jury's seven weeks of conscientious effort and violated Plaintiffs' Seventh Amendment rights.

### A. Defendants Waived Any Affirmative Defense of Qualified Privilege.

Defendants' post-trial assertion of a qualified privilege was waived because it was never previously raised. As a result, Plaintiffs were deprived of fair notice, before and during trial, that Defendants were relying on any such affirmative defense. There cannot be a starker example of manifest injustice than (a) ignoring the absence of prior notice, (b) after the fact placing the burden of proving actual malice to override the privilege on unsuspecting Plaintiffs (JA 4786; ADD-9), and, most egregiously, (c) rejecting the jury's finding of malice[14] on the basis that "a reasonable jury" would not have so found (JA 4785-86; ADD-8-9) and ruling that Plaintiffs' evidence of malice was insufficient as a matter of law.

In their respective Answers to the operative Fifth Amended Complaint, Defendants each asserted twelve affirmative defenses, none of which referenced any form of privilege or asserted any defense specific to the DOJ Investigation. JA

---

[14] The jury was asked about malice because punitive damages are available under New York law malicious breaches of fiduciary duty. *Don Buchwald & Assocs. v. Rich*, 723 N.Y.S.2d 8, 9 (N.Y. App. Div. 2001).

152, 153, 159-60; JA 171, 172, 178-79.  Neither Defendant moved to assert

additional affirmative defenses.[15]

Nor did Defendants take any action whatsoever before or during trial to

correct the waiver.  From all appearances, Defendants had no intention of asserting

privilege:[16]  They requested no jury instruction (Dkt. 250 at 51 and 52); raised no

such suggestion in the Charge Conference (JA 6082-6113); and asserted no

objection to the Judge's Charge (JA 8636-40, 8642-44).

Perhaps most tellingly, Defendants did not raise a qualified privilege defense

in their lengthy FRCP 50(a) motion.  JA 1719-59.  The trial court's decision to set

aside the jury verdicts on grounds that were not presented in the pre-verdict motion

violates Plaintiffs' Seventh Amendment rights.  *See Morante v. American Gen.*

*Fin. Ctr.*, 157 F.3d 1006, 1010 (5th Cir. 1998).

The law in this circuit is clear: "Any argument omitted from the Rule 50(a)

motion made at the close of evidence is waived as a ground for judgment under

---

[15]  Qualified privilege is an affirmative defense and is therefore subject to waiver. *See Scott v. Young Life*, 710 N.Y.S.2d 279, 279 (N.Y. App. Div. 2000) (plaintiff is not required to prove malice unless and until defendant meets its own burden of proving affirmative defense of qualified immunity); *Zeevi v. Union Bank of Switzerland*, No. 89-Civ-4637, 1993 U.S. Dist. LEXIS 5760, at *23 (S.D.N.Y. April 30, 1993) (same); *Demas v. Levitskey*, 738 N.Y.S.2d 402, 410-11 (N.Y. App. Div. 2002) (same); 14 N.Y. Practice, New York Law of Torts Sec. 1:51 (2013) (same).

[16]  Given that no authority exists supporting such a privilege in this fiduciary context, that is hardly surprising.  *See* § I.C, *infra*.

Rule 50(b)." *Munoz v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R.*, 671 F.3d 49, 58 (1st Cir. 2012); *see also Jones ex rel. United States v. Mass. Gen. Hosp.*, 780 F.3d 479, 487 (1st Cir. 2015) ("a failure to raise an issue prior to a Rule 50(b) motion for judgment as a matter of law, without more, results in a waiver of that issue").

The underlying policy for the waiver rule is that of fair notice: A Defendant's FRCP 50(a) motion must state the Defendant's argument with "sufficient certainty to apprise the court and opposing counsel of the movant's position." *Osorio v. One World Techs, Inc.*, 659 F.3d 81, 88 (1st Cir. 2011) (internal citation omitted).

The word "privilege" does not appear in Defendants' FRCP 50(a) papers (JA 1716-60); but, the trial court ruled that the privilege argument was "adequately subsumed" in the FRCP 50(a) argument that "the reporting did not, as a matter of law, constitute a breach of fiduciary duty." JA 4780; ADD-3. By the court's logic, every affirmative defense (e.g., privilege, statute of limitations, statute of frauds) is preserved merely by alleging in a Rule 50(a) motion without further explanation that a particular claim fails as a matter of law.

The sole case upon which the court relied was *Osorio*, 659 F.3d at 88, cited for the principle that an argument that simply seeks to "flesh out" a prior argument is not waived. JA 4781; ADD-4. But, the court erred in applying *Osorio*, where

- 21 -

the Defendant had contested the challenged issue (alternative design) at "each stage of the litigation."  659 F.3d at 87-88.  That is not true here, where Defendants never made any mention of a purported qualified privilege (or any privilege at all) at any earlier stage of the multi-year litigation.  Hence, the defense was waived. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1196 (1st Cir. 1995) ("[t]he movant cannot use [a Rule 50(b) motion] as a vehicle to introduce a legal theory not *distinctly articulated* in its close-of-evidence motion for a directed verdict."). It was also waived for purposes of this appeal.  *See Perdoni Bros., Inc. v. Concrete Systems, Inc.*, 35 F.3d 1, 4 (1st Cir. 1995) (appellate review limited to the specific grounds in the motion for directed verdict).[17]

### B.    The Court Erred By Making Predicate Findings Of Fact.

As a necessary predicate for its holding that the DOJ Investigation was subject to a qualified privilege, the Court made a finding of fact that Anchin's outreach to the DOJ was a "self-report"[18] of Defendants' own campaign contribution conduct.  This judicial finding related to one of the most hotly contested issues in the entire trial (*contrast, e.g.,* JA 8668-74 *with* JA 8720-23),

---

[17]  With specific regard to the waiver of a privilege defense, *see Chrabaszcz v. Johnston Sch. Comm. et al.*, No. 03-133S, 2007 U.S. Dist. LEXIS 2846, at *19 (D.R.I. Jan. 12, 2007).

[18]  The finding is unexplained.  The Court simply states that, as a result of an allegation in Plaintiffs' initial Complaint, Anchin "retained counsel, and on advice of counsel 'self-reported' the probable campaign finance law violations."  JA 4785; ADD-8.

and it was quite clearly contrary to the jury's finding on the same issue.[19]  The

Court therefore improperly usurped the role of the jury.[20]

To support the predicate "self-report" finding, the Court made additional

findings of subsidiary fact.  In each such instance, the Court relied on *Defendants'*

evidence and inexplicably ignored Plaintiffs' directly contrary evidence.  For

example:

The Court found that, "[t]here was [] evidence that [Cornwell] was aware, at

least as to[the Hillary Clinton] 2008 campaign, that she could not *under applicable*

*law* directly contribute the sum she wanted to contribute." JA 4785; ADD-8

(emphasis added).  However, Cornwell's evidence was that she understood that she

was restricted, *not by law*, *but by the Clinton campaign*, from contributing as much

as she wished.  ("I was instructed by Evan that the campaign had a restriction on

---

[19]  As noted above, Plaintiffs asked for punitive damages in their Closing only with regard to the DOJ Investigation.  JA 8721-23.  (Although counsel took the position in court submissions that any and all acts could be considered, she did not make that argument to the jury.)  In addition, given that separate seven figure verdicts were awarded for negligence and breach of contract (JA 1789-1791), coupled with the size of the breach of fiduciary duty verdict, the DOJ Investigation necessarily comprised all or a significant part of the latter.

[20]  This was particularly surprising given the Court's recognition of the role of the jury in his instructions to them:  "Obviously, the parties have significant disagreements as to what the facts are and what they mean.  And that's the principal responsibility of the jury in a case like this, to determine what the facts are and what they mean.  It's often said that the jurors are the sole and exclusive judges of the facts of the case."  JA 8723.

how many seats you could get… You can't have all of them because other people may want to buy these seats.")  JA 8155-56.

The Court also found that "Ms. Cornwell acknowledged that Mr. Snapper's structuring and reimbursement of the contributions was done *at her instance*."  JA 4786; ADD-9.  But, Cornwell did not acknowledge that she instigated the reimbursements; rather, she testified that she "authorized" Snapper to reimburse her own family and her close friend's family, "after he told me it was okay to do so."  JA 8155.  Similarly, the court found that Cornwell "denied only that she knew it was *criminally wrong*" (emphasis added).  JA 4786; ADD-9.  But, Cornwell actually testified several times that she did not know that the reimbursements were wrong at all, criminally or otherwise.  JA 8155 (no idea it was either a crime or a violation of regulations); JA 4786; ADD-9 (same); JA 8164 (no idea it was "illegal or improper").

In sum, the trial court repeatedly usurped the jury's role as fact finder, in order to support a privilege that was not applicable.

## C. Extensive Evidence Existed That Defendants True Motive Was Not a "Self-Report" [21]

Examples of the evidence that Defendants did not "self-report" to the DOJ, but used a reporting mechanism as a vehicle to blame Cornwell for Snapper's conduct, include the following:

### The Initial Reports

Bryan Cave LLP, at Anchin's behest, filed a written submission stating that "Mr. Snapper acted *under the direction of Ms. Cornwell*" (emphasis added).  JA 7253-54.  Cole then visited DOJ and reiterated that Cornwell *directed* Snapper to put together the mechanism for the reimbursements.  JA 7327.  Snapper himself visited DOJ and told the prosecutors that he had carried out the scheme under Cornwell's direction and for her benefit.  JA 7945-46.[22]  In other words, both Anchin and Snapper characterized Snapper as Cornwell's pawn in the unlawful reimbursement scheme.

### Crediting Snapper's Explanation Without Asking Cornwell to Respond

Plaintiffs alleged in the original Complaint (JA 76-95), that the records returned to them by Anchin included an unauthorized payment of $5000 from her

---

[21]  The same evidence supports the jury's finding of malice, and undercuts the Court's ruling (JA 4785-86; ADD-8-9) that Plaintiffs proffered insufficient evidence as a matter of law to prove that Defendants acted with actual malice.

[22]  Apparently Cole's arguments were very persuasive: When Snapper spoke to the prosecutors himself, they "asked over and over again if I ever told Ms. Cornwell it's illegal, and they wanted me to say yes, and I didn't.  I told the truth. … and they wanted me to implicate her, and I didn't" (emphasis added).  JA 7904.

funds to Snapper personally, with a subject line wishing his daughter, whom Cornwell had never met, a "happy Bat Mitzvah" (the "Bat Mitzvah check"). JA 84. Confronted with an allegation that essentially charged him with conversion of a client's funds, Snapper went to Anchin Managing Partner Frank Schettino, who had already seen the Complaint (JA 7233-40), and told him that the check was a reimbursement for a contribution on Cornwell's behalf to Hillary Clinton's 2008 Presidential campaign. JA 7425-26 .

Snapper's explanation was chronologically impossible: Clinton was not yet a candidate when the Bat Mitzvah check was written. JA 7426-27. Nonetheless, Anchin's Executive Committee did not inquire of Cornwell or her counsel concerning her version of facts surrounding the Bat Mitzvah check or Snapper's allegation. Instead, Schettino called in Anchin's outside counsel Bryan Cave. JA 7252, 7254-56. Even upon learning that Snapper had falsified CEI's books to hide the reimbursements – a fact that Snapper admits that he never disclosed to Cornwell (JA 7417-18) – Schettino refrained, purportedly at the direction of counsel,[23] from reaching out to Cornwell. JA 7258-59, 7271-72.

---

[23] Plaintiffs' counsel then queried, "As long as you see fit to tell us you were given directions by your counsel on this specific subject, sir, what did you and your counsel discuss regarding whether to reach out to Patricia Cornwell?" The Court sustained Defendants' objection. JA 7272.

To justify reporting to DOJ, as opposed to the Federal Election Commission, Anchin needed to conclude that Cornwell's "direction" to Snapper was done with knowledge that it was criminal.[24]  Schettino told the jury that Snapper provided the Executive Committee with that assurance.  (JA 7327-28).  But, Snapper told the jury that he did not himself realize the conduct was criminal (JA, 7411-12, 7437-38), and never told Cornwell that the conduct was illegal.  JA 7932.

At the same time that the Executive Committee concluded, without asking her, that Cornwell knew the conduct was illegal,[25] the Committee accepted the representations of four Anchin employees and Anchin partner Ira Yohalem, all of whom received reimbursements through Snapper from Cornwell's account (JA 7258), that they did not know that the conduct was illegal.  JA 7318-19, 7322-23.

<u>Altering Testimony to Avoid Ramifications of Crediting Snapper's Original Impossible Representation</u>

On the matter of Snapper's original representations, Schettino contradicted himself, and was then contradicted by Snapper.  Specifically, Schettino testified at trial that Snapper's initial explanation was that the $5000 was a reimbursement for

---

[24]  The statute that criminalizes campaign finance reimbursements (2 U.S.C.S. § 441f) requires that the offending person know that her or his conduct is illegal. Otherwise, the penalties are addressed under non-criminal portions of the Federal Election Campaign Act.  Ms. Cornwell's knowledge of illegality – or lack thereof – was therefore critical.  *See United States v. Danielczyk*, 788 F. Supp. 2d 472, 493 (E.D.  Va.  2011) overruled on other grounds by 683 F.3d 611 (4th Cir.  2012).

[25]  Cornwell, as noted above, testified that she had no idea the conduct was improper, much less criminal.  JA 8148-49, 8155, 8164.

a contribution to James Gilmore, who was a candidate at the relevant time.  JA
7241-44.  This, Schettino was forced to concede, was a change from his sworn
testimony at his deposition, which he categorized as a mistake, regarding a Clinton
reimbursement.  *Id.*  Unfortunately for Schettino, Snapper then testified that
Schettino had been right the first time:  In his initial conversation with Schettino,
Snapper "mistakenly" credited the $5000 check to a reimbursement for a Clinton
contribution (JA 7426-27), and only realized his "error" in consultation with
Anchin's lawyers a few days later.  JA 7439-40.

### Temporal Proximity/Timeline

Plaintiffs filed their original Complaint on October 13, 2009.  JA 14.  The
meeting between Snapper and Schettino occurred promptly.  JA 7239.  Within a
few days of that meeting, Anchin brought in Bryan Cave LLP, and specifically
Bryan Cave partner James Cole.  JA 7243.

Anchin's and Snapper's attorneys first spoke with DOJ in early to mid
November 2009 (JA 7945-46), within a month of the filing of this lawsuit.
Snapper met with DOJ shortly thereafter.  JA 7945-46.

On December 29, 2009 (eleven weeks after the filing of this litigation), Cole
met privately with Raymond Hulser, the Acting Chief of the DOJ's Public Integrity

Section.  JA 8359-61.[26]  By January 7, 2010, less than three months after the

commencement of this litigation and about a week after Cole met with Hulser, a

Grand Jury had been convened to address the issues raised by Cole on Anchin's

behalf.  JA 9493.  Based on the information conveyed by Anchin and Snapper,

DOJ told Bryan Cave that they felt no need to participate in any independent

investigation of Anchin, and agreed that Anchin could conduct its own

investigation with the assistance of the law firm.  JA 7341-42, 7347.  In contrast,

before the end of January, DOJ caused eight Federal Bureau of Investigation

("FBI") agents to descend without warning upon Cornwell's family and friends as

part of the DOJ Investigation.  JA 8157-58.

<u>Communications Between Anchin's Attorneys and the DOJ</u>

The jury did not hear testimony from any Bryan Cave attorney or DOJ

witness.  However, they did have the benefit of Bryan Cave's file on the DOJ

Investigation (JA 9474-9864), obtained via Plaintiffs' subpoena in the course of

the trial.  (JA 8345-47) (Exhibits 281/281-001).[27]

---

[26]  For purposes of Plaintiffs' Recusal Motion, the court knew that Cole previously served as Deputy Chief of the Public Integrity Section, and for the last two to three years of that stint supervised Hulser.  JA 5844.

[27]  Although acknowledging that Bryan Cave LLP was indeed Anchin's law firm in connection with the DOJ Investigation, Sadan testified that he saw no need to request their file in response to Plaintiffs' discovery requests pertaining to the DOJ Investigation.  JA 8364.

- 29 -

The earliest correspondence in the file, a letter from DOJ prosecutor Daniel Petalas ("Petalas") to Cole, confirmed that the FBI was "conducting a criminal investigation into alleged violations of federal laws," as "a result of information that you [Cole] provided at the request of your client, Anchin, Block & Anchin, LLP." Petalas's letter requested the "responsive records *identified in your recent discussion with Raymond N. Hulser*" (emphasis added) (JA 9864). The "responsive records" that Cole had identified for Hulser were "any and all documents *relating to Patricia Cornwell*, including but not limited to those pertaining to political contributions" (emphasis added), *as well as documents relating to Cornwell's family members and close friends*. JA 8359-61; *see also* JA 9474. Petalas sent the letter the day after Cole and Hulser discussed Anchin's contention that Snapper arranged illegal reimbursements at the direction of Cornwell. JA 7326; 7259-60.

Jurors were entitled, and perhaps compelled, to infer from the content and tenor of the communications in that file that these were not communications between prosecutors and the targets or subjects of their investigation. Rather, they were, rather, prosecutors' communications with a cooperating witness.

Examples include:

- Requests from Bryan Cave to Petalas for approval of, or guidance relating to, events in this civil lawsuit. *See, e.g,*. JA 9668 (seeking DOJ approval for Anchin to produce records); JA 9672 (seeking guidance as

- 30 -

to whether Anchin's civil trial counsel should inform the trial court "about our communications, and if so what he should say").[28]

- A not-so-subtle suggestion by a Bryan Cave attorney that DOJ consider taking action to prevent key depositions from proceeding in this lawsuit. JA 9671 ("We wanted you to know [about the deposition notices] in case you and your colleagues are interested in taking any action about depositions of the key players being taken. Please let me know if there is anything that you would like us to do.").

- Cooperative efforts regarding a DOJ motion to intervene in, and to stay, this litigation (the "Stay Motion"). *See, e.g.*, JA 9673 (forwarding of advance electronic copies of the Stay Motion, to Anchin's lawyers only) (*see also* JA 19 at 7/20/2010)); JA 9754 (DOJ request for confirmation that Anchin had no objection to DOJ proceeding with the Stay Motion, and Anchin's affirmation that it did not object); JA 9756 (Anchin's request for guidance as to whether to respond to the Stay Motion, and DOJ's suggestion that Anchin wait for Plaintiffs' response, which "may touch on issues that give reason or opportunity for Anchin to respond, if appropriate."); JA 9805-06 (sharing by DOJ with Bryan Cave of correspondence with Plaintiffs' counsel in this litigation).

- Anchin's continuing efforts to provide DOJ with evidence against Cornwell. *See, e.g.*, JA 9808 ("Are you available this afternoon for a conference call…? There is some information that we want to bring to your attention," *i.e.* an email relating to the Clinton concert (JA 9828).).

- Informal and friendly outreach by DOJ to Anchin's lawyers. *See, e.g.*, JA 9830 ) ("While we are in NYC, if you are so inclined, [co-prosecutor] Teddy [Kang] and I would be happy to meet with you briefly, if only to have the opportunity to say 'hello' in person").

Equally telling is that which does not appear in the file, to wit: any

suggestion whatsoever that Defendants were "self-reporting." JA 9474-9864.

---

[28] No disclosure was made.

<u>In Summary</u>

All of the foregoing evidence supports the jury's finding that Defendants did not file a good faith "self-report;" but, rather, within weeks of the filing of this lawsuit, sought a vehicle by which to accuse Cornwell of directing the commission of a felony. By inexplicably disregarding the jury's finding that Defendants acted with bad motives, the Court violated Plaintiffs' Seventh Amendment rights. *See Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 78 (1st Cir. 2001) ("Courts traditionally defer to the wisdom of juries in the resolution of fact-sensitive questions."); *Cash v. County of Erie*, 654 F.3d 324, 342 (2d Cir. 2011) ("[I]t is plain that proper deference to the parties' Seventh Amendment rights to a jury trial precludes entry of a judgment that disregards any material jury finding.").

**D.** **In Ruling That a Qualified Privilege Attaches To a Fiduciary's Purported "Self-Report", The Court Erred In Analogizing To a Defamation Case Involving No Fiduciaries.**

Even if the Court had been justified in finding that Defendants' disputed conduct constituted a "self-report," which it was not, it erred in holding that such a "self-report" gave rise to a qualified privilege.

The Court, borrowing the language of Defendants' 50(b) submission, cited to a single case as authority for the proposition that the conduct of a fiduciary who self-reports in a fashion that inaccurately implicates his beneficiary in a crime is protected by a qualified privilege. That case, *Toker v. Pollak*, 44 N.Y.2d 211

(N.Y. 1978), is but one in a long line of defamation cases recognizing a qualified privilege when one person incorrectly, but without malice, accuses another of a crime.[29] According to the trial court, "[u]nder New York law, [Defendants'] self-report was subject to a qualified privilege, and can be the basis for actionable liability only if the Defendants made knowingly or recklessly false statements or were motivated solely by malice." JA 4785; ADD-8. *Toker*, however, says no such thing. Indeed, as far as Plaintiffs have been able to ascertain, <u>no</u> authority exists for the proposition that a qualified privilege protects a fiduciary who "self-reports" in a manner that falsely – whether by design or lack of diligence – implicates his beneficiary in a crime, either for the fiduciary's own self-interest or for a more nefarious purpose. Were that to be true, a fiduciary's obligation of utmost good faith in his dealings with and on behalf of his beneficiaries would be eviscerated. *Cf. Gayle Martz, Inc. v. Sherpa Pet Group, LLC*, 651 F. Supp. 2d 72, 81 (S.D.N.Y. 2009).

In *Toker,* the Defendant (a non-fiduciary) was accorded a qualified privilege against liability for statements made to an Assistant District Attorney in an on-going criminal investigation that Defendant did not initiate. 376 N.Y.2d at 217-18.

---

[29] Plaintiffs agree that defamation case law involving a false accusation of a crime could be instructive with regard to damages standards. But, one cannot determine the parameters of liability of a fiduciary for such a false accusation by applying standards applicable to a non-fiduciary.

Obviously, those facts are a far cry from those in the case at bar. In addition, the
actual holding in *Toker* is considerably different from that adopted by the Court
from Defendants' submission. By its terms, the *Toker* holding invalidates the trial
court's reliance upon it:

> A qualified privilege is sufficient to foster the purpose of encouraging
> citizens to come forth with information concerning criminal activity.
> *If the information is given in good faith by an individual who believes
> the information to be true, he is protected against the imposition of
> liability **in a defamation action**,* notwithstanding that another, perhaps
> possessed of greater wisdom, would not have reported the information
> . . . [W]hile not providing an absolute cloak of protection, a qualified
> privilege does provide an atmosphere in which *a civic-minded citizen
> may, without fear, convey information which he believes the
> disclosure of which will redound to the benefit of the public*. Only
> those who act out of malice, rather than public interest, need hesitate
> before speaking.

*Id.* at 221(emphasis added).

The trial court's extension of this holding to this case gives rise to several
insurmountable hurdles:

First, the Defendant in *Toker* was not a fiduciary to the Plaintiff and
therefore did not owe a duty of utmost trust and care.

Second, *Toker* is only applicable by its terms to "liability in a defamation
action" where concepts of good faith, actual malice, and privilege are standard
fare.

Third, the requirement that the information be "given in good faith by an individual who believe[d] the information to be true," was a determination to be made by the jury, not the court.

Fourth, nothing in the record suggests that Anchin was acting as a "civic-minded citizen" or in the "public interest." Indeed, even viewed through the favorable lens employed by the trial court, "the evidence [is] that the Defendants had a motive to mitigate any punishment that might be imposed on them by initiating a self-report" (JA 4786; ADD-9), *i.e.*, a motivation of self-interest, rather than public interest or civic-mindedness.[30] In addition, the jury actually found Defendants' conduct was "*intentional or deliberate, occurred under aggravating or outrageous circumstances, and/or willfully or wantonly disregarded the Plaintiffs' rights.*" (JA 1790).

In short, *Toker* could not properly be used to strip Plaintiffs of the jury's fiduciary duty verdicts.

### E. The Record Supports The Jury's Finding of Actual Malice.

In a somewhat different context, i.e., whether Defendants' breach justified punitive damages, the jury found that Defendants' conduct was "intentional or deliberate, occurred under aggravating or outrageous circumstances, and/or willfully or wantonly disregarded the Plaintiffs' rights." JA 1790. That standard

---

[30] It is Plaintiffs' position, as found by the jury, that Defendants' actual motives were considerably more nefarious.

- 35 -

meets the New York definition of malice. *See, e.g.*, *Zaidi*, 194 Misc. 2d at 9 (defining malice under New York law). Hence, Plaintiffs proved actual malice in the breach of fiduciary duty context, even though they had no way of knowing that such proof was necessary to overcome an undisclosed privilege assertion.

But, the trial court ruled that "[a] *reasonable* jury would not have had a sound evidentiary, as distinguished from speculative, basis for finding that the Defendants acted with actual malice"[31] (emphasis added) (JA 4786; ADD-9), thereby implicitly declaring that this conscientious, hard-working jury was not "reasonable."

One need only read the testimony regarding the DOJ Investigation elicited by Plaintiffs from Schettino[32] (JA 7233-44, 7252-7299) and Sadan (JA 7315-28,

_____

[31] The district court based this particular finding on the belief that "[i]n her own testimony, Ms. Cornwell acknowledged that Snapper's structuring and reimbursement of the contributions was done at her instance; she denied only that she knew it was criminally wrong." JA 4786; ADD-9. The Court was wrong. *See* § I.B., *supra*. Further, he concluded that "[t]he sole evidentiary basis" for Plaintiffs' contention that Defendants acted maliciously was "that the report was made by the defendants after they had been first fired and then sued by the plaintiffs." Id. Here, too, nothing could be further from the truth. *See* § I.C, *supra*.

[32] Anchin's failure to investigate Snapper's explanation of the Bat Mitzvah check before informing DOJ that Cornwell had directed the commission of a felony constitutes evidence of both reckless disregard and malice. *See Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 190 (2d Cir. 2000) (affirming finding of reckless disregard and actual malice when defendant failed to question information provided despite having a reasonable basis for doubting its accuracy and veracity); *see also New Testament Missionary Fellowship v. E.P. Dutton & Co., Inc.*, 491 N.Y.S.2d 626, 627 (N.Y. App. Div. 1985) (holding that there was an issue of fact

7341-49), along with the Bryan Cave LLP file (JA 9474-9864), to find ample evidentiary support for the finding of actual malice. Much more evidence existed as well. *See* § I.C., *supra*, incorporated here by reference; *see also Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence indicating that the Defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice.").

Once again, by inexplicably ignoring the jury's finding, the Court violated Plaintiffs' Seventh Amendment rights.

### F. The Court Erred In Permitting Defendants To Rely In Part On A Defense Of Advice Of Counsel With Regard to the DOJ Investigation, While Refusing On the Basis of Attorney-Client Privilege To Permit Cross-Examination Regarding That Advice.

In ruling that the evidence was insufficient to support a finding of malice as a matter of law, the trial court specifically referenced Defendants' reliance on advice of counsel in "self-reporting" to DOJ. JA 4785; ADD-8. Indeed, the testimony from Schettino and Sadan made it quite clear that they claimed to be relying on advice of counsel in (a) deciding not to ask Cornwell for her response to Snapper's representations (JA 7254-55) before initiating the DOJ Investigation (JA 7302), (b) concluding that she "knew" the reimbursements were illegal (JA 7324), and (c) determining that no independent internal investigation was necessary (JA

---

as to defendants' actual malice when they "had obvious reasons to doubt . . . [the] veracity or accuracy" of the reports on which they based their speech).

7341-43, 7347).  Further, Sadan acknowledged that the Executive Committee did not discuss Snapper's conduct "or anything else that had to do with this case" without an attorney present or on the phone, in part because they wanted all of their communications to be subject to attorney/client privilege.  JA 7348-49.

Notwithstanding that purported reliance on advice of counsel as evidence of proper motivation and due diligence, the Court consistently refused to permit Cornwell to examine Anchin's witnesses regarding the advice given,[33] even when Defendants selectively volunteered pieces of that advice.  *See, e.g.*, JA 7272 ("As long as you see fit to tell us you were given directions by your counsel on this specific subject, sir, what did you and your counsel discuss regarding whether to reach out to Patricia Cornwell?") and JA 7348 (with regard to whether to do independent investigation, "[w]hat else did your attorneys say, since you're volunteering for us what they told you?").

---

[33]  With regard to the trial court's repeated sustaining of objections on the basis of attorney/client privilege, *see, e.g.*, JA 7272 ("As long as you see fit to tell us you were given directions by your counsel on this specific subject, sir, what did you and your counsel discuss regarding whether to reach out to Patricia Cornwell?"); JA 7292 ("Did you instruct your counsel to contact the Department of Justice Criminal Division?"); JA 7348 (with regard to whether to do independent investigation, "[w]hat else did your attorneys say, since you're volunteering for us what they told you?") ; JA 7391-92 ("What did Bryan Cave inform you was the results of their investigation?"); JA 7392 ("Mr.  Sadan, are you – are you prepared to tell us what your attorneys told the executive committee?"); *Id.* ("Did your attorneys tell you the results of their investigation?").

- 38 -

Far from warming up to Plaintiffs' position, the trial judge finally stopped

counsel in her tracks as she sought to elicit the conversations, by proclaiming, in

the presence of the jury, "[e]nough."  JA 7392.  Shortly thereafter, Defendants'

counsel noted at sidebar, in his efforts to halt further such inquiries, that the court

had ruled upon the privilege issues "over and over and over again."  JA 7440.

The trial court's exclusion of Plaintiffs' questions regarding the advice

received from counsel was a patently incorrect application of the attorney-client

privilege doctrine.  The privilege "is a shield and must not be used as a sword."

*American Re-Insurance Co. v. United States Fid. and Guar. Co.*, 40 A.D.3d 486,

492 (N.Y. App. Div. 2007).[34]  Accordingly, the privilege "may implicitly be

waived when a party asserts a claim that in fairness requires examination of

protected communications."  *Goldberg v. Hirschberg*, 10 Misc. 3d 292, 295 (N.Y.

Sup. Ct. 2005) (internal citations and quotations omitted).  "The

quintessential example of such a waiver arises when a Defendant asserts an advice-

of-counsel defense and is thereby deemed to have waived his attorney-client

privilege with respect to the advice that he received."  *Skyline Steel, LLC v.

Pilepro, LLC*, 2015 U.S. Dist. LEXIS 95929, at *4 (S.D.N.Y. July 22,

---

[34]  New York law governs attorney-client privilege determinations in this case.  JA
7454-55.  *See also* F.R.E. 501 ("[I]n a civil case, state law governs privilege
regarding a claim or defense for which state law supplies the rule of decision.");
*Command Transp., Inc. v. Y.S. Line (USA) Corp.*, 116 F.R.D. 94, 95 (D. Mass.
1987).

2015) (internal quotation marks omitted); *cf. In re von Bulow*, 828 F.2d 94, 101 (2d
Cir. 1987) ("It has been established law for a hundred years that when the client
waives the privilege by testifying about what transpired between her and her
attorney, she cannot thereafter insist that the mouth of the attorney be shut.").  An
implied waiver also occurs when a party "places at issue factual assertions the truth
of which can only be assessed by examination of the privileged information."
*Goldberg*, 10 Misc. 3d at 296 (internal quotation marks omitted).  Once waiver is
found, "the widely applied standard for determining the scope of a waiver is that
the waiver applies to all other communications relating to the same subject
matter."  *Skyline Steel*, 2015 U.S. Dist. LEXIS at *5 (internal quotation marks
omitted).

    Throughout trial, Defendants invoked the advice of counsel defense in an
effort to cast the DOJ contact as a good-faith "self-report" rather than (as Cornwell
contends, and the jury found) a malicious, false accusation that its former client
directed the commission of a crime.  By raising such a defense and putting the
legal advice Anchin received from Bryan Cave at issue, Defendants waived the
attorney-client privilege.  *See Goldberg*, 10 Misc. 3d at 295-96; *Skyline Steel*, 2015
U.S. Dist. LEXIS at *5.

    The District Court thus abused its discretion when it refused to permit cross-
examination regarding the legal advice that Bryan Cave provided to Anchin.  *See*

- 40 -

*United States v. Bilzerian*, 926 F.2d 1285, 1293 (2d Cir. 1991) ("[C]ourts cannot

sanction the use of privilege to prevent effective cross-examination on matters

reasonably related to those introduced in direct examination.").

## II.  THE COURT ERRED IN REVERSING SEVERAL PRIOR RULINGS REGARDING THE STATUTE OF LIMITATIONS APPLICABLE TO THE BREACH OF FIDUCIARY DUTY COUNTS AND ALLOWING DEFENDANTS' RULE 50(B) MOTION WITH REGARD TO ALL DAMAGES INCURRED MORE THAN THREE YEARS BEFORE FILING OF THE LAWSUIT.

On at least five occasions before Defendants filed their FRCP 50(b) motion

post-trial, the parties sparred over the governing law with regard to the statute of

limitations on Plaintiffs' breach of fiduciary duty claim.[35]  In every instance,

Defendants contended that the limitation period was three years based on the

remedy sought, and Plaintiffs contended that (a) the limitation period was tolled

until the end of the fiduciary relationship under the continuing representation

doctrine, or (b) the limitation period was six years because the fiduciary

---

[35]  *See* Defendants' Motion for Partial Summary Judgment Seeking Dismissal of All Claims Premised on the Missed Book Deadline, at JA 188-89; Defendants' Motion for Leave to File Additional Papers on Motion for Judgment as a Matter of Law (R. 50(a) at JA 1720; Defendants' Memorandum Addressing Applicable State of Limitations for Breach of Fiduciary Duty Under N.Y. Law (JA 1769-72); the instruction provided to the jury (JA 8630-42); the declination to provide a modified instruction following a jury deliberation question (JA 8753-54); and the further declination following a submission by Defendants ("I'm not going to change the instructions at this point.  New York law is, surprisingly to me, not very coherent on these topics, but I'm not convinced that the jury has been, at this point, misinstructed.")  JA 8768-69.

relationship was based in contract.  In every instance, the trial court concluded that Plaintiffs' legal argument was correct.[36]

Without warning or opportunity for further comment by the parties, the trial judge reversed himself thirteen months post-trial in the context of Defendants' FRCP 50(b) motion.  The court "conclude[d] that [its] instruction regarding the limitations period for the breach of fiduciary duty count (and claims) was erroneous," and that a limitations period of three years, rather than six or a period that was tolled, applied to this count and its claims.  JA 4782-83; ADD-5-6.  The Court erred as a matter of law.

### A.  The Court Erred in Refusing to Apply the Continuing Representation Doctrine.

In reversing its earlier several rulings, the trial court held that the continuing representation doctrine tolls the running of the statute of limitations, not for the duration of the fiduciary relationship, but "only so long as the Defendant continues to represent Plaintiff in connection with the particular transaction which is the subject of the action and not merely during the continuation of general professional relationship."  JA 4784; ADD-7.  The court further states that "the Plaintiffs complain about the manner in which the Defendants handled specific, discrete real estate transactions in the early part of 2006."  *Id*.  The Court is in error as a matter

---

[36] *See* n. 38.

of law with regard to the first point, and misconstrues the factual record with regard to the second.[37]

The parties' mutual understanding of the continuing nature and scope of a fiduciary's obligation is the crux of the continuous representation inquiry. *Williamson v. PricewaterhouseCoopers, LLP*, 872 N.E.2d 842, 847-48 (N.Y. 2007); *see also Zorn v. Gilbert*, 8 N.Y.3d 933, 934 (N.Y. 2007) ("The continuous representation doctrine tolls the statute of limitations … where there is a mutual understanding of the need for further representation on the specific subject matter [in dispute].") (internal citations and quotations omitted); *Symbol Techs., Inc. v. Deloitte & Touche, LLP*, 888 N.Y.S.2d 538, 541 (N.Y. App. Div. 2009) (applying continuous representation doctrine where parties "mutually contemplated that [the accountant's] work and representation for each audit year would continue after the issuance of the audit opinion").

Pursuant to Defendants' proposal to Cornwell and CEI, which was accepted and became their contract (JA 7524-25), Defendants intended to do that which Cornwell's family office was doing at the time. JA 7624. As it happened, one of

---

[37] It is necessary to note at the outset that the trial court adopted Defendants' practice of treating the "Missed Deadline" as if Defendants had a fiduciary duty to ensure that Cornwell met her book deadlines. *See* JA 4782-83. Plaintiffs make no such assertion. The missed book deadline is not a separate claim, nor does it relate to a separate fiduciary duty. Rather it is an element of damages in Plaintiffs' claim that Defendants breached their on-going fiduciary duty to manage Plaintiffs' real estate. *See* 5th Amended Complaint, JA 98 at 104 (¶ 15(e)); JA 115 (¶34(j)(iv)); JA 120-21.

the major tasks of the family office was to attend to Cornwell's real estate needs, and particularly to ensure appropriate locations free of noise and distraction where she could write JA 8120.  Once Defendants took over Cornwell's family office responsibilities, Snapper was involved with "every aspect" of Plaintiffs' real estate needs, and was overseeing "everything there was to be done with regard to rental or acquisition."  JA 6404.  The parties clearly understood that Defendants would have a continuing responsibility to handle Plaintiffs' real estate needs (JA 6404 (Gruber), 7624 (Snapper) (read in conjunction with 8120) (Cornwell), 8544-45 (Fasinski)), not simply handle discrete assignments as requested by Plaintiffs.

A long line of cases, which the trial court chose to ignore in its Rule 50(b) Order, recognizes that the limitations period for a breach of fiduciary duty claim will typically be tolled until either the fiduciary openly repudiates the relationship or the relationship otherwise ends, without any requirement that the claim concerns a "particular transaction."  *See, e.g., Marchig v. Christies Inc.*, 430 F. App'x 22, 24-25 (2d Cir. 2011); *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 518-19 (2d Cir 2001); *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 169-70 (E.D.N.Y. 2010); *Westchester Religious Inst. v. Kamerman*, 691 N.Y.S.2d 502, 503 (N.Y. App. Div. 1999).  "The statute of limitations normally does not begin running on a breach of fiduciary duty claim 'until the fiduciary has openly repudiated his or her obligation or the relationship has been otherwise terminated.'" *Marshall v. Milberg*

- 44 -

*LLP*, No. 07-6950, 2009 U.S. Dist. LEXIS 121208, at *29 (S.D.N.Y. Dec. 23,

2009) (quoting *Golden Pac. Bancorp*, 273 F.3d at 518-19).  The doctrine has been

applied to toll claims in multiple professions.  *Frank Mgmt., Inc. v. Weber*, 549

N.Y.S. 2d 317, 320-22 (N.Y. Sup. Ct. 1989).  Tolling is allowed for the duration of

the relationship so that the client may continue to rely on the "fiduciary's skill

without the necessity of interrupting a continuous relationship of trust and

confidence by instituting suit." *Marshall*, 2009 U.S. Dist. LEXIS, at *29  (*citing*

*Golden Pac. Bancorp*, 273 F.3d at 519).

    Application of the tolling principle in this case is consistent with the parties'

mutual understanding that Defendants' duty to handle Plaintiffs' real estate needs

was ongoing,[38] and not limited to discrete real estate transactions as presented by

Plaintiffs on a case by case basis.  The ongoing nature of Defendants' duty in

practice is apparent from a cursory review of the record.[39]  No evidentiary basis

exists for the trial court's Balkanization of the real estate management role.  *See*

*Williamson*, 872 N.E.2d at 847-48 (distinguishing between annual engagements for

---

[38]  *See, e.g.*, JA 6404 (Gruber), 7624 (Snapper) in conjunction with 8120
(Cornwell), 8544-45 (Fasinski).

[39]  For example, the Garfield acquisition, renovation debacle, project shutdown,
and disposition spanned January of 2005 through August of 2009, i.e., the entire
period of the relationship.  JA 6405, 6407-17; 6477-78; 6486-6516.  The aborted
and mishandled Renaissance acquisition was in May 2005.  JA 6383-92.  The
problematic 5th Avenue, N.Y. rental was in the summer of 2006 (JA 6243-46), as
was the delayed Trump Tower rental.  JA 6473-78.  The failure of due diligence
for the Monument purchase was in August of 2006.  JA 6479-82.

the provision of separate and discrete audit services and "a course of representation as to the particular problems (conditions) that gave rise to Plaintiff's malpractice claims").

Even if the trial court were correct that the limitation period is triggered by a "particular transaction," which it was not, in this instance that "particular transaction" would be the obligation to manage real estate in a manner that permitted Cornwell to complete *Book of the Dead*. That process began in March of 2006 (well within the limitation period) and culminated with the late delivery of the book in April of 2007. JA 8118-45.

In sum, the Court ruled correctly the first five times, and erred as a matter of law when it reversed itself thirteen months post-trial.

**B. The Court Erred In Ruling That A Three-Year, as Opposed to Six Year, Statute Of Limitations Applied.**

In its Rule 50(b) Order, the Court cited *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268 (N.Y. 2009) and a related New York Appellate Division case, *Scott v. Fields*, 925 N.Y.S.2d 135 (N.Y. App. Div. 2011). The Court appears to have adopted Defendants' argument, which it had previously (and correctly) rejected several times, that *IDT* established that fiduciary duty claims seeking damages are subject to a three-year limitations period, regardless of whether such claims arise out of contractual relationships. But, in reaching this new and different conclusion, the Court acknowledged that "New York law is not

pellucid on this point." JA 4782; ADD-5. Indeed, while a minority of decisions following *IDT* have reached a conclusion similar to the Court's new conclusion, many others – including two from the United States Court of Appeals for the Second Circuit – have recognized that a fiduciary duty claim *seeking damages* is subject (under long-standing New York law) to a six-year limitations period if the claim has its genesis in the parties' contractual relationship. The claims in the present case arise from a contractual relationship. *See* JA 8771-74; 7524-25.

It has been the law of New York for decades that a six-year limitations period applies to claims like Plaintiffs' where the fiduciary duties at issue arose out of a contract between the parties. *See In re Lloyd's Am. Trust Fund Litig.*, 2002 U.S. Dist. LEXIS 22663, at *41 (S.D.N.Y. Nov. 26, 2002) (New York law applies a "six-year limitations period for fiduciary duty actions with genesis in contractual relationship") (citing *Frank Mgmt.*, 549 N.Y.S. 2d at 318-20; *In re Argo Commc'ns Corp.*, 134 B.R. 776, 787 (Bankr. S.D.N.Y. 1991) ("[N]umerous New York Courts have applied the six-year limitations period to breach of fiduciary duty claims"); *Rodriguez v. Cent. Parking Sys. of New York, Inc.*, 17 Misc. 3d 108, 110, 848 N.Y.S.2d 807 (N.Y. Sup. Ct. 2007) (applying six-year limitations period in part because "the asserted liability . . . had its genesis in the contractual relationship of the parties").

- 47 -

The decision in *Malmsteen v. Berdon, LLP*, 369 F. App'x 248 (2d Cir. 2010), is particularly instructive:  The plaintiff, a professional musician, sued his business manager/accountant on several grounds, including breach of fiduciary duty and breach of contract.  *Id.* at 249.  The Second Circuit held that a six-year limitations period applied to Plaintiff's fiduciary duty claim seeking monetary damages because that claim had "its genesis in the contractual relationship of the parties."  *Id.* at 250-51; *see also Lia v. Saporito*, 541 F. App'x 71, 75-76 (2d Cir. 2013) (citing *IDT* for the general rule that a three-year statute of limitations period normally applies to a fiduciary duty claim for damages, but recognizing that a six-year limitations period could nonetheless apply if such a "claim . . . [had] its genesis in any . . . contract with [Defendant]"); *Speedfit LLC v. Woodway United States*, 53 F. Supp. 3d 561, 582 (E.D.N.Y. 2014) ("[T]he statute of limitations for a breach of fiduciary duty claim sounding in contract is six years."); *Ironshore Ins. Ltd. v. W. Asset Mgmt. Co.*, No. 11-05954, 2012 U.S. Dist. LEXIS 76818, at *11 (S.D.N.Y. May 30, 2012) ("Because [Plaintiff's fiduciary duty] claim has its genesis in a contractual relationship, a six-year statute of limitations applies and the claim is timely.") (citing *Malmsteen*, 369 F. App'x at 250-51).

## III.   IF THIS COURT REVERSES WITH REGARD TO THE DOJ INVESTIGATION AND THE APPLICABLE STATUTE OF LIMITATIONS, THE VERDICTS SHOULD BE REINSTATED WITHOUT A RETRIAL.

The trial court's rulings on the FRCP 50(b) motion eliminated without possibility of retrial Plaintiffs' claims relating to (a) the DOJ Investigation (insufficient evidence of malice), (b) NetJets losses (insufficiency of the evidence generally), and (c) damages occurring before October 13, 2006 (statute of limitations).  JA 4779-89; ADD-2-12.  All remaining claims were set for retrial pursuant to FRCP 59 because the Special Verdicts did not allow the Court to determine and deduct the damages for the dismissed claims.  JA 4789; ADD-12.  If this Court reverses the findings and rulings relating to the DOJ Investigation and to the damage period, the verdicts should simply be reinstated in their entirety,[40] remitted if necessary to remove the relatively small NetJets damages.

### A.   The NetJets Damages Should Be Reinstated, Or Simply Remitted.

The Court ruled that Plaintiffs had presented insufficient evidence as a matter of law to support damages relating to Defendants' negligent handling of the NetJets contracts.  JA 4786-87; ADD-9-10.

Without objection, Plaintiffs proffered evidence to support NetJets damages in the amount of $532,000.  JA 6535-39.  The jury heard evidence about Snapper's

---

[40]   *See* § III.B.1, *infra*, for argument as to why the surviving claims should be reinstated as well.

lackluster efforts in negotiating reduced costs and increased benefits with NetJets. For example, when Plaintiffs expressed concerns to Snapper about NetJets, he simply forwarded them to his liaison with comments that were not always helpful to his clients. *See, e.g.*, Ex. 019, JA 8784. Post-Anchin, Dr. Gruber assumed responsibility for the NetJets relationship and immediately succeeded in negotiating a five-year contract with saving of $232,000 and "perks" worth over $300,000, for a total value of $532,000. JA 6538-39. Dr. Gruber explained to the jury in some detail the basis for the value gained, e.g., a less expensive plane, complimentary upgrades when a different plane type was required, elimination of various flight minimum times for shorter flights, and a multi-hour free "demo" flight. JA 6538-39. The evidence was sufficient for the issue to go to the jury and for the jury's verdict to be sustained. *See Mass. Eye & Ear Infirmary*, 552 F.3d at 57 (in evaluating Rule 50(b) motion, "a jury's verdict and factual findings '*must* be upheld unless the facts and inferences *viewed in the light most favorable to the verdict* point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict.'") (emphasis added).

If, however, this Court concludes that the evidence was insufficient, the appropriate course on this issue is for the court to remit, or remand to remit, the total verdict by $532,000. Plaintiffs would accept that solution. Following twenty-six days of trial and a compensatory verdict in excess of $24 million, addressing an

arguable error with a maximum verdict of $532,000 by ordering a retrial would be nonsensical and a waste of the courts' time.

**B.    If this Court Reverses with Regard to Either the DOJ Issue or the Statute of Limitations, But Not Both, the Remaining Issues Should be Reinstated for Retrial and Discovery Should Be Granted on the Sidley Austin Recusal Motion.**

*1.    Because Proceeding to Retrial on the Claims Remaining After the FRCP 50(b) Decision Was Not Feasible Before This Appeal, Those Claims Should Be Added to Any Retrial Post Appeal.*

When the trial court unexpectedly reversed its statute of limitations rulings, and entered judgment as a matter of law for Defendants relating to the DOJ Investigation, Plaintiffs were suddenly deprived of their two most significant issues.  Two additional decisions by the trial court forced Plaintiffs to walk away from a retrial in the summer of 2015 on the surviving claims, until such time as this Court determines the status of the claims dismissed pursuant to FRCP 50(b).

First, the trial court denied (JA 4886) Plaintiffs' well-founded Motion for Entry of Partial Final Judgment Pursuant to Fed. R. Civ. P. 54(b) and/or Certification of an Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b), and Stay of Proceedings Pending Appeal (the "FRCP 54(b) Motion").  JA 4790-4801.  Pursuant to that motion, Plaintiffs sought to have this Court determine whether the trial court's reversal of the jury verdicts with regard to the DOJ Investigation and the damages occurring before October 6, 2006 (including the damages for the

missed book deadline) would stand, or whether the jury verdicts would instead be reinstated. The dismissed claims were severable from the remaining claims, and the relief sought should have been granted to prevent the distinct possibility – in Plaintiffs' view, probability – of three trials.

Second, the trial court denied (JA 5940) Plaintiffs' Motion to Disqualify Sidley Austin LLP, or, in the Alternative for Expedited Discovery to Determine Whether such Disqualification is Mandated and/or for an Evidentiary Hearing Regarding Same (the "Recusal Motion"). JA 5837-62.

The limited issues remaining after the Court's March 25, 2014 Order[41] remain viable because such claims were resolved "based upon Plaintiffs' representation that they will not present further evidence with respect to theories unresolved by the Court" (JA 5942), and that resolution was compelled by the circumstances. As Plaintiffs' counsel explained to the Court, (i) a retrial of the limited remaining claims was economically infeasible, given a reduced probable value to those claims of approximately $2.5 million in the absence of evidence relating to the eliminated claims (JA 6212-14), with an estimated cost of retrial at

---

[41] As specified by the Court in a pre-trial hearing on June 17, 2015, the surviving jury claims were "the administration of Garfield, investments, taxes, and Anchin's invoicing practices or non-practices, and the general handling and management of funds." JA 6193; *see also* JA 5835.

or about the same level[42] (*Id.*); and (ii) the Court's erroneous denial of the Recusal Motion caused Plaintiffs, who were already struggling to come to grips with the Court's FRCP 50(b) Order, too much discomfort to proceed under the circumstances.[43]

Reinstating those claims for retrial would be consistent not only with fundamental fairness, but with existing case law. Permitting litigants to obtain appellate review while still preserving other claims pending a successful appeal is particularly appropriate where "[a] federal court trial on the few remaining [claims] would not be an efficient use of [Plaintiff's] time and resources." *James v. Price Stern Sloan*, 283 F.3d 1064, 1068 (9th Cir. 2002) (noting that there was "no evidence of intent to manipulate appellate jurisdiction"); *see also Doe v. United States*, 513 F.3d 1348, 1354 (Fed. Cir. 2008) (noting that "appellants have

---

[42] Plaintiffs' counsel estimated the cost of retrial at approximately $2.5 million (JA 6213), which is considerably less than the actual cost of the trial and immediate pre-trial period the first time around. *See* JA 1814-3209. Mathematical computation suggests that the fees and costs for the trial and the preceding four months totaled $3,258,407.03.

[43] *See* Tr. of July 9, 2015 Hearing at JA 6213-14:

> MS. LUKEY: This is among the most difficult things I've had to do in a professional context in 40 years of practice. I feel as if the plaintiffs have been placed in a most unfortunate situation having prevailed on all counts in a jury trial that lasted 26 days. I understand that your Honor reached certain legal conclusions a little over a year later and you took away the effect of that trial. Obviously, we respectfully, but strongly, disagree with your Honor's rulings. I wish the plaintiffs were not in this position and I wish I did not have to do this.

explained that their remaining claim is of minor significance and is not worth

taking through trial").

           2.      *Plaintiffs' Recusal Motion Should Be Reinstated So That*
                     *Discovery Can Proceed.*

In March of 2015, Cole, who left his post as Deputy Attorney General in

January, joined Sidley as a partner. JA 5878-79. Although at least one motion

relating to Cole was underway at the time that he joined Sidley, Sidley did not

inform the court or Plaintiffs; and Plaintiffs only who learned about it on-line in

June of 2015. JA 6194-96; JA 5930-31. The trial court erred in denying the

Recusal Motion, at very least with regard to permitting the requested limited

expedited discovery or a hearing to determine whether Plaintiffs' concerns of an

information imbalance were well founded. JA 5837-42.[44]

Rule 1.1 of the Massachusetts Rule of Professional Conduct ("MRPC 1.1")

prohibits a lawyer from exploiting, *or even appearing to exploit*, public office for

the advantage of a private client. Of particular note, subsection (b) provides that "a

lawyer having information that the lawyer knows is confidential government

information about a person acquired when the lawyer was a public officer or

employee, may not represent a private client whose interests are adverse to that

---

[44] For example, Schettino testified that Anchin was "cleared of all charges" by the
DOJ Investigation. JA 7305. Cornwell was told only that the investigation was
over and she would not be indicted. One is left to query from whom Anchin
received the news of exoneration.

person in a matter in which the information could be used to the material disadvantage of that person." At a minimum, the Court should have ordered targeted discovery to determine whether Cole learned information as Deputy Attorney General about Cornwell, *e.g.*, why the Grand Jury did not indict, that "could be used to the material disadvantage" of Cornwell.

Based upon the results of targeted discovery, Sidley could also be disqualified in light of the restrictions imposed by Federal Rule of Criminal Procedure 6(e), which prohibits government attorneys, among others, from disclosing "a matter occurring before the grand jury." James Cole was the nominee for Deputy Attorney General for the last several months of the investigation, and was sworn in just weeks after Cornwell was told the investigation was over. *See* JA 5837-43.

In opposition to the Recusal Motion, Cole submitted an affidavit that was instructive as much for omission as for content: While Cole states that at no time did he "receive any confidential government information relating to the *investigation* into the campaign bundling scheme involving Anchin and Patricia Cornwell" (emphasis added) (JA 5878-79), he stops short of saying that he does not know what happened at the Grand Jury. For example, if the Grand Jury refused to indict, that fact would not necessarily be considered "confidential government information relating to the investigation," but would be probative of

Anchin's good or bad faith in reporting to the DOJ that Cornwell directed the commission of the crime. At very least, discovery would have permitted Plaintiffs to ascertain that fact and would perhaps have given them some comfort.[45]

## IV. THE COURT ERRED IN REFUSING TO AWARD EQUITABLE FORFEITURE IN LIGHT OF THE SPECIAL VERDICT REGARDING DEFENDANTS' CONDUCT.

The Court erred in failing to order that Anchin forfeit the compensation it received from CEI, Ms. Cornwell, and Dr. Gruber during the entirety of their relationship, and, instead, initially dismissing the claim (JA 4643-44; ADD-18-19) and subsequently reinstating it for retrial. JA 5835.

The claim for equitable forfeiture was within the province of the trial court. The Court reserved on the claim pending the jury's verdict and stated that the only question that the jury was expected to answer bearing on that claim was whether in fact a breach of fiduciary duty had occurred. JA 8623-24 (THE COURT: "Okay, So [the jury] will decide the fiduciary question, breach or not. If they find a breach then subsequent to their verdict, we can have whatever proceedings are necessary on an application for forfeiture.").

The jury's special verdicts (which were still in place at the time of the Court's equitable forfeiture ruling) amply support – indeed, compel – a finding of

---

[45] Public confidence in the judicial system is critically important. An author and a neuroscientist – or for that matter, a teacher, administrative assistant, salesperson, etc. – cannot be expected to be as indifferent to the Beltway's revolving door as lawyers and judges may be.

disloyalty and therefore equitable forfeiture.  Under New York law, "[o]ne who

owes a duty of fidelity to a principal and who is faithless in the performance of his

services is generally disentitled to recover his compensation whether commissions

or salary." *Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928-29 (N.Y. 1977); *see*

*also Astra, Inc. v. Bildman*, 455 Mass. 116, 130 (2009) ("application of New

York's 'faithless servant' doctrine requires [Defendant] to forfeit ***all*** of his salary

and bonuses ... for the period of disloyalty and … the judge was without authority

to rule otherwise") (emphasis added).  Where the Court is called upon to rule on an

equitable claim for which the factual predicate has already been determined by the

jury, the Court is not free to disregard the jury's factual findings regarding breach

and willfulness.  *See, e.g., Beacon Theatres, Inc.*, 359 U.S. at 503-504; *Fishman*

*Transducers, Inc. v. Paul*, No. 07-10071-GAO, 2011 U.S. Dist. LEXIS 32749 (D.

Mass. Mar. 29, 2011).

The Court's principal reason for denying Plaintiffs any recovery on the

equitable forfeiture claim was that "[f]rom the general verdict it is impossible to

identify what the jury thought the period of disloyalty was so that an appropriate

amount of forfeiture can be calculated.  Under the circumstances, I cannot make a

reasoned determination of the period of disloyalty, *unless it was the entire period*

*of the relationship*." (emphasis added).  JA 4643; ADD-18 (citing *Astra, Inc.* 455

Mass. at 130)[46]  Plaintiffs proffered significant evidence that the period of

disloyalty was indeed the entire period of the relationship with Anchin, from

January of 2005 through August of 2009.  Such evidence included the following

matters for the period of the full relationship: mishandling of Plaintiffs'

investments (JA 6346-48, 8087-89, 7084-85); money mismanagement (JA 7009-

24); improper check writing and wiring practices (JA 7042-45); improper use of

debt versus cash on hand (JA 7064-85); real estate mismanagement (*see* n. 39);

failure to invoice (JA 6540-41); and mishandling of campaign contributions (JA

8148-49).

   If the Court needed guidance beyond this on the period of disloyalty in

fulfilling its obligation to determine the amount of any forfeiture; it was free to put

an advisory question to the jury.  Plaintiffs had no reason to know that the Court

had any such concern, particularly where Defendants – who denied any period of

disloyalty – offered no evidence of a shorter period.

   Plaintiffs are entitled to the return of the full and undisputed amount of the

fees paid to Anchin during the course of the business relationship, to wit,

$3,463,891.91.  JA 10139-40; *see Astra, Inc.,* 455 Mass. at 130.

---

[46]  The Court also noted, "[e]ven if, alternatively, I were to find a narrower period
of disloyalty (a finding that might be foreclosed by a broader jury finding), in light
of the jury's punitive damage award, as well as the size of the compensatory
award, I would not regard it as equitable to make an additional disgorgement
order."  JA 4643-44; ADD-18-19.

## V.  THE COURT ERRED IN RULING AS A MATTER OF LAW THAT PLAINTIFFS WERE NOT ENTITLED TO DAMAGES, IN THE FORM OF REASONABLE ATTORNEYS' FEES AND COSTS, UNDER MASSACHUSETTS GENERAL LAWS CHAPTER 93A.

### A.  The Court Erred in Ruling That Massachusetts Statutory Law Cannot Apply In Conjunction with New York Common Law.

The trial court held that it was "inconsistent and illogical for the Plaintiffs to now contend the Massachusetts statutory law should also be chosen to apply" where Plaintiffs agreed at trial that New York law governed the common law claims.  JA 4639; ADD-14.  The court neglected to mention that Plaintiffs made it clear throughout trial that, while New York common law applied, M.G.L. c. 93A also applied.[47]

The court erred in ruling that Massachusetts statutory law cannot apply where New York common law governs the common law claims.  In a diversity case, a federal court is not required to apply the laws of only one state.  Rather, "[a] Plaintiff may bring claims under Massachusetts law even where other claims in the same case are governed by the law of a different jurisdiction."  *Value Partners S.A. v. Bain & Co.*, 245 F. Supp. 2d 269, 274 (D. Mass. 2003); *see also,*

---

[47]  *See, e.g.*, Trial Day 14: COURT:  "I don't think we formally absolved applicability of state law, although my understanding of the state of play is, I think – maybe even the plaintiffs would say that New York law applies except that 93A also applies."  LUKEY:  "Correct, you honor … As you have just indicated, we have agreed that, generally New York common law applies, but the law in Massachusetts under 93A is 93A applies if a business does harm to individuals residing in Massachusetts." JA 7455.

*e.g., Putnam Res. v. Pateman*, 958 F.2d 448, 465 (1st Cir. 1992) (explaining the principle of decapage, which "erects the framework under which different issues in a single case, arising out of a common nucleus of operative facts, may be decided according to the substantive law of different states."); *First Sec. Bank, N.A. v. Nw. Airlines, Inc.*, No. 95-12103, 2001 U.S. Dist. LEXIS 26601, at *13 (D. Mass. Jan. 3, 2001) (application of Minnesota law to contract claims did not preclude the application of c. 93A to consumer protection claims); *Kelley v. Riccelli Enters. of Mass., Inc.*, No. 10-P-1796, 2011 Mass. App. LEXIS 1272, at *1 (Mass. App. Ct. Oct. 11, 2011) (c. 93A was applicable even though New York law applied to common law claims). If such a rule did not exist, Massachusetts consumers of products produced elsewhere, *e.g.*, pharmaceuticals or automobiles, could not avail themselves of the protection of Chapter 93A when pursuing claims in diversity in federal courts in the Commonwealth.

**B.  The Court Erred In Ruling That Choice Of Law Principles Required Application of New York Consumer Protection Law.**

Massachusetts courts apply "a functional choice of law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004); *see also Bushkin Assocs., Inc. v. Raytheon Co.*, 473 N.E.2d 662, 669 (Mass. 1985) (quoting Restatement (Second) Conflict of Laws sec. 6). The states'

relative interest in the adjudication of the claims is a paramount factor. *See Value Partners*, 245 F. Supp. 2d at 276-78.

Massachusetts' interest in ensuring that its consumer residents are protected against unfair acts or practices of out-of-state product and service providers surely outweighs New York's interest in protecting a local accounting firm from its own willful, wanton or egregious malfeasance in providing services to Massachusetts residents. *See States Police Benev. Assoc., Inc. v. First Choice Armor & Equip., Inc.*, 241 F.R.D. 85, 93 (D. Mass. 2007) ("Moreover, because state consumer protection laws are intended to protect consumers, the Court concludes that the laws of the home states will govern here."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 83 (D. Mass. 2005) ("The conclusion that the home state of the consumer has a more significant relationship to the alleged fraud than the place of business of the Defendant is in accordance with the principles of Restatement Sec. 6, since state consumer protection statutes are designed to protect consumers rather than to regulate corporate conduct."); *see also Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 314 (Mass. 2002) ("We read the language of G.L. c. 93A as a clear statement of legislative policy to protect Massachusetts consumers …"). The trial court erred in finding that New York law governs under choice-of-law principles. JA 4640-42; ADD-15-17.

## VI.   THE COURT ERRED IN ITS POST-TRIAL INTEREST COMPUTATIONS.

Pursuant to Federal Rule of Appellate Procedure 37(b), in the event that the judgments are reversed and the verdicts reinstated, this Court's mandate must contain instructions about the allowance of interest.  Plaintiffs respectfully request that this Court instruct the trial court as follows:

*Prejudgment Interest for Breach of Fiduciary Duty Damages*

New York law applies to interest calculations regarding the Special Verdict, as the trial court correctly ruled.  Dkt. No. 393; *see Crowe* v. *Bolduc*, 365 F.3d 86 (1st Cir. 2004) (when a Plaintiff secures a jury verdict based on state law, the law of that state governs the award of prejudgment interest).  The court also correctly ruled that "[u]nder [N.Y. C.P.L.R.] § 5001(a), the Plaintiffs are entitled to a simple 9% pre-verdict interest per annum…".  However, the Court erred in holding that interest was available "*only as to the damages awarded for breach of contract* ($2,677,955)" (emphasis added).  The court erred in refusing to award prejudgment interest on Plaintiffs' damages for breach of fiduciary duty.

 In New York, where prejudgment interest is available on money damages, such interest is a matter of right, *Lucente* v. *Int'l Bus. Machines Corp*., 151 F. Supp. 2d 484, 487 (S.D.N.Y. 2001), *rev'd on other grounds*, 310 F.3d 243 (2d Cir. 2002); that is, the trial court does not have discretion in making the award.  *New*

- 62 -

*Eng. Ins. Co.* v. *Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 603 (2d Cir. 2003).[48]

Plaintiffs are entitled to interest for damages arising from Anchin's breach of fiduciary duty because such damages are subject to C.P.L.R. § 5001(a).  *See*, *e.g.*, *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508-09 (2d Cir. 1991) (reversing district court for failing to award pre-judgment interest on claim for breach of fiduciary duty); *Fox v. Koplik*, No. 12-6784, 2013 U.S. Dist. LEXIS 123254, at *84 (Aug. 14, 2013) ("New York law allows for the recovery of prejudgment interest on claims for breach of fiduciary duty at the statutory rate of 9% simple interest per annum."); *Gibbs* v. *Breed, Abbott & Morgan*, 693 N.Y.S.2d 426, 432 (N.Y. Sup. Ct. 1999), *rev'd on other grounds*, 710 N.Y.S.2d 578 (N.Y. App. Div. 2000) ("In a case of breach of fiduciary duty, the aggrieved party is entitled to prejudgment interest.").

Upon reinstatement of the verdicts, Plaintiffs request that the trial court be instructed to award interest on the breach of contract and breach of fiduciary (compensatory) damages in accord with C.P.L.R. § 5001(a).

---

[48]  The statute itself provides:

> Interest shall be recovered upon a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property, except that in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion.

N.Y. C.P.L.R. § 5001(a).

*Post-Verdict/Prejudgment Interest*

Upon reinstatement of the verdicts, Plaintiffs request that the trial court be instructed to award interest in accord with N.Y. C.P.L.R. § 5002, for the post-verdict/prejudgment period on all categories of damages entitled to same.

*Post-Judgment Interest*

Upon reinstatement of the verdicts and entry of judgment in accordance with the verdicts, Plaintiffs request pursuant to 28 U.S.C. § 1961 that the trial court be instructed to award post-judgment interest on all damages, compensatory and punitive, running from date of the re-entered judgment on the verdicts until satisfaction of such judgment.

## CONCLUSION

Plaintiffs seek reinstatement of the jury verdicts, and a remand with instructions that (a) judgment enter in accord with the verdicts, (b) judgment enter on the equitable forfeiture claim for the full amount of fees paid by Plaintiffs to Defendants; (c) the District Court conduct a hearing to determine the reasonable attorneys' fees and costs to which Plaintiffs are entitled under M.G.L. c. 93A; (d) discovery be permitted on the Recusal Motion; and (d) interest be computed as set forth above.

Respectfully submitted,


/s/ *Joan A. Lukey*
Joan A. Lukey (1st Cir. Bar No. 14225)
Stuart M. Glass (1st Cir. Bar No. 64338)
Justin J. Wolosz (1st Cir. Bar No. 70575)
Kevin C. Quigley (1st Cir. Admission Pending)
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA  02110
Tel:  (617) 248-5000
Fax:  (617) 248-4000


Dated:  October 27, 2015

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

I, Joan A. Lukey, certify as follows:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B), and this Court's Order of October 19, 2015, because this brief contains 15,630 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Time New Roman in 14 point.

/s/ *Joan A. Lukey*
Joan A. Lukey

7102757v1

## CERTIFICATE OF SERVICE

I certify that, on October 27, 2015, I caused the foregoing document to be electronically filed with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system. I further certify that a copy of the foregoing document will be served by hand or first class mail upon these parties or counsel of record upon acceptance by the clerk.

| | |
|---|---|
| Jack W. Pirozzolo<br>SIDLEY AUSTIN LLP<br>60 State Street, 34th Floor<br>Boston, MA 02109<br>Tel: (617) 223-0304<br>Fax: (617) 223-0301 | Carter G. Philips<br>Paul John Zidlicky<br>Eric D. McArthur<br>SIDLEY AUSTIN, LLP<br>1501 K St. N.W.<br>Washington, D.C. 20005<br>Tel: (202) 736-8000<br>Fax: (202) 736-8711 |
| Gary F. Bendinger<br>Jackie Lu<br>SIDLEY AUSTIN LLP<br>787 7th Ave., 24th Floor<br>New York, NY 10019<br>Tel: (212) 839-5387<br>Fax: (212) 839-5599 | Thomas R. Manisero<br>Gregory Bautista<br>William J. Kelly<br>Peter J. Larkin<br>WILSON, ELSER, MOSKOWITZ,<br>EDELMAN & DICKER<br>3 Gannett Drive<br>White Plains, NY 10604<br>Tel: (914) 323-7000<br>Fax: (914) 323-7001 |

*/s/ Joan A. Lukey*
Joan A. Lukey

**ADDENDUM TO PLAINTIFFS'-APPELLANTS' OPENING BRIEF**

**TABLE OF CONTENTS**

| Document | Addendum Page No. |
|---|---|
| Order Granting in Part and Denying in Part Motion for Judgment as a Matter of Law and Granting Motion for New Trial, March 25, 2014 (Dkt No. 457) | Add-2 |
| Opinion and Order on Claims for Unfair or Deceptive Acts or Practices and Equitable Forfeiture Denying Motion for Attorney's Fees and Denying Plaintiffs' Post-trial Petition for Damages, May 28, 2013 (Dkt No. 392) | Add-13 |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11708-GAO

CORNWELL ENTERTAINMENT, INC., et al.,
Plaintiffs,

v.

ANCHIN, BLOCK & ANCHIN LLP, et al.,
Defendants.

ORDER
March 25, 2014

O'TOOLE, D.J.

The plaintiffs, Cornwell Entertainment, Inc. ("CEI"), Patricia Cornwell, and Staci

Gruber, filed a multiple count complaint against the defendants, Anchin, Block & Anchin LLP

and Evan Snapper. After a twenty-six day trial, the jury returned a verdict for the plaintiffs on the

three counts submitted to them: negligent performance of professional services, breach of

fiduciary duty, and breach of contract. The jury awarded the plaintiffs a total of $50.9 million,

including $22.4 million in punitive damages. The remaining counts of the complaint were either

dismissed or resolved by order of the Court in the defendants' favor.

Pursuant to Federal Rules of Civil Procedure 50 and 59, the defendants have moved for

judgment as a matter of law and/or for a new trial.

**I.** **Judgment as a Matter of Law – Rule 50(b)**

A. Legal Standard

Under Rule 50,

If a party has been fully heard on an issue during a jury trial and the court finds
that a reasonable jury would not have a legally sufficient evidentiary basis to find
for the party on that issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). The Court may not make credibility determinations or weigh the evidence presented at trial. See Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 39 (1st Cir. 2010) (citations omitted). However, a party opposing a Rule 50 motion must "present more than a mere scintilla of evidence and may not rely on conjecture or speculation." Id. (internal quotation marks omitted).

    B.    Waiver

The defendants' renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) "is bounded by [their] earlier [Rule 50(a)] motion," and they cannot "introduce a legal theory not distinctly articulated in [their] close-of-evidence motion for a directed verdict." Parker v. Gerrish, 547 F.3d 1, 12 (1st Cir. 2008) (citing Correa v. Hosp. San Francisco, 69 F.3d 1184, 1196 (1st Cir. 1995)). The plaintiffs contend that the defendants have in their renewed motion raised the following new arguments that were not pressed in their Rule 50(a) motion and therefore must be regarded as waived: (1) the evidence is insufficient to support a claim based on the missed book deadline allegations; (2) the defendants' conduct in connection with the DOJ investigation is privileged; (3) the plaintiffs presented no evidence of causation or damages in connection with Garfield; and (4) there is no basis for punitive damages.

I agree with the plaintiffs that issues identified as (1), (3), and (4) were waived by failure to present them in the Rule 50(a) motion, but I agree with the defendants that the argument that their actions in reporting a potential campaign finance law violation was privileged is adequately subsumed in the argument, made in the Rule 50(a) motion, that the reporting did not, as a matter of law, constitute a breach of fiduciary duty. See Osorio v. One World Techs. Inc., 659 F.3d 81,

88 (1st Cir. 2011) (concluding that an argument that "simply seeks to 'flesh out'" a prior argument is not waived).

C.   Claims and Issues

As noted above, three counts of the operative complaint were tried to the jury, asserting negligence, breach of contract, and breach of fiduciary duty. In support of the three asserted causes of action, the plaintiffs presented evidence of a variety of different acts or omissions that they claimed supported a jury verdict in their favor as to each cause of action. In other words, the plaintiffs' evidence offered the jury multiple ways of concluding that the defendants had acted negligently or in breach of contract or fiduciary duty. As a consequence, it was possible, for example, for the jury to find that the defendants were culpably negligent under all the various theories of liability presented or under some but not others. The same is true for the other counts. The plaintiffs' position now is a little difficult to understand, but it appears to be that unless the defendants can establish that there is *no* theory of liability sustained by the evidence that can support a recovery under a particular count, the defendants' motion must be denied as to *any* theory of liability proposed under that count.

The plaintiffs offered evidence of different ways the defendants could be held negligent: mismanagement of real estate, mismanagement of investments, carelessness in preparing tax returns, etc. Each occasion of negligence was alleged to have caused a distinct harm and therefore different potential damages. There were similar alternate theories presented for the other counts. There is no reason why those various separate potential bases for liability cannot be separately evaluated under Rule 50 and those found wanting of adequate evidentiary support weeded out. That is actually the purpose of the Rule 50 analysis. Suppose, for example, in an action for breach of fiduciary duty by a trustee with regard to two distinct trusts that there was

insufficient evidence as to a breach with respect to the first trust, but a sufficient basis for finding a breach as to the second. Rule 50 would authorize the court to submit only the issue (or claim or theory) as to the second trust to the jury and to grant judgment as a matter of law against the claimant as to the first. The plaintiffs' apparent argument to the contrary is meritless.

    D.    <u>Statute of Limitations</u>

The jury was instructed to apply a three-year statute of limitations as to Counts I (negligence) and III (breach of contract).[1] Specifically, the jury was instructed that "[a] finding for the plaintiff[s] on the theories of professional negligence or breach of contract to perform professional services must be based on evidence of liability-producing events that have occurred within the three-year period prior to the commencement of the suit; that is, from October 13, 2006, onward." (Tr. Day 25 at 31.) The jury was also informed that the "statute of limitations in question does not affect the claim for breach of fiduciary duty." (<u>Id.</u>)

Upon reexamination of the New York Civil Practice Laws and Rules and the relevant case law, I conclude that my instruction regarding the limitations period for the breach of fiduciary duty count (and claims) was erroneous. After reconsideration, I conclude that the applicable statute of limitations is also three years as to the plaintiffs' claims for breach of fiduciary duty. New York law is not pellucid on this point, but it appears to be the correct rule that "the statute of limitations for a breach of fiduciary duty cause of action depends on the substantive remedy which the plaintiff seeks." <u>Scott v. Fields</u>, 925 N.Y.S.2d 135, 138 (N.Y. App. Div. 2011); <u>accord</u> <u>IDT Corp. v. Morgan Stanley Dean Witter & Co.</u>, 907 N.E.2d 268, 272 (N.Y. 2009). Because the plaintiffs here seek only monetary relief, the breach of fiduciary duty claims

---

[1] "[A]ction[s] to recover damages for malpractice . . . regardless of whether the underlying theory is based in contract or tort" must be commenced within three years. N.Y. C.P.L.R. § 214(6).

are construed as "alleging 'injury to property' within the meaning of CPLR 214(4), which has a three-year limitations period." Id. (citation omitted).

     E.    Missed Book Deadline

As previously noted, the defendants have waived the argument that the plaintiffs' claims[2] involving the missed book deadline for Book of the Dead are not supported by legally sufficient evidence. Their argument that such claims are barred by the statute of limitations was properly preserved, however.

The plaintiffs contend that the defendants' failure to find a suitable place for her to concentrate on her writing caused Ms. Cornwell to miss her book deadline, preventing her from receiving her expected August 2006 advance until the following year.

The plaintiffs' claim involving Ms. Cornwell's missed book deadline accrued, at the latest, when she failed to submit her manuscript in August 2006. See Snyder v. Town Insulation, Inc., 615 N.E.2d 999, 1000 (N.Y. 1993) (holding that tort action accrued on date of injury, though the plaintiffs continued to sustain harm thereafter). The plaintiffs' contention that Ms. Cornwell suffered no injury until she turned in the manuscript for Book of the Dead in 2007, at which point "the book transformed from a 2006 release to a 2007 release" and her 2006 advance "morphed into her 2007 advance," (Pls.' Opp'n to Defs.' R. 59 Mot. at 19 (dkt. no. 420)), ignores the fact that she lost her entitlement to the advance when the scheduled time for payment, August 2006, came and went without her having satisfied the condition for payment, the submission of her manuscript. That that loss was but the first in a series of consequential harms

---

[2] The Court notes that the plaintiffs did not assert, either in their Amended Complaint (dkt. no. 77) or at trial, that Ms. Cornwell missed her book deadline because the defendants breached their fiduciary duty by being disloyal to her or acting in bad faith. The plaintiffs' theory was primarily that the defendants failed at the task of securing an appropriate place where she could write. The missed book deadline claim was therefore one grounded in the count for negligence.

is of no moment; that phenomenon is commonplace in tort and contract actions. The principle remains that the cause of action accrues when the first in a series of harms caused by a defendant's negligence has materialized. <u>Snyder</u>, 615 N.E.2d at 1000, 1002-1003. Since a cause must precede its effect, any negligence that caused the August 2006 loss necessarily occurred prior to then, well prior to three years before the commencement of the present action.

The so-called continuous representation doctrine does not help the plaintiffs. That doctrine tolls the running of the statute of limitations "only so long as the defendant continues to represent plaintiff in connection with the particular transaction which is the subject of the action and not merely during the continuation of general professional relationship." <u>Transp. Workers Union of Am. Local 100 AFL-CIO v. Schwartz</u>, 821 N.Y.S.2d 53, 56 (N.Y. App. Div. 2006) (internal quotation marks omitted); <u>see also</u> <u>Zaref v. Berk & Michaels</u>, 595 N.Y.S.2d 772 (N.Y. App. Div. 1993) ("[T]he facts are required to demonstrate continued representation in the specific matter directly under dispute."). Here, the plaintiffs complain about the manner in which the defendants handled specific, discrete real estate transactions in the early part of 2006. The fact that Mr. Snapper and Anchin continued to be retained by the plaintiffs to handle other real estate matters, among other things, beyond October 2006 does not support application of the doctrine.

For the foregoing reasons, the defendants are entitled to judgment as a matter of law as to any claims involving the 2006 missed book deadline. This is not insignificant. The plaintiffs' witnesses ascribed a loss of some $16 million to this claim, the largest single element of the various claims of damage, and the size of the jury award suggests that the jury found in the plaintiff's favor on this time-barred claim, though given the generality of the verdict questions this cannot be surely determined.

F.    DOJ Investigation

The plaintiffs asserted at trial that the defendants breached their fiduciary duty to the plaintiffs by maliciously reporting to the Department of Justice that Ms. Cornwell had violated federal campaign finance laws. According to the plaintiffs, the evidence at trial showed that "Anchin accused Ms. Cornwell—a former client to whom it owed a fiduciary duty—of a serious crime without making any effort to contact her for confirmation or refutation." (Pls.' Opp'n to Defs.' Rule 50(b) Mot. at 12-13 (dkt. no. 415).)

There was evidence that Ms. Cornwell was interested in public affairs and over time made a number of contributions to political candidates. There also was evidence that she was aware, at least as to a 2008 campaign, that she could not under applicable law directly contribute the sum she wanted to contribute and that she approved Mr. Snapper's solicitation of various persons to make contributions that would be reimbursed to them from Ms. Cornwell's funds. Both Mr. Snapper and Ms. Cornwell testified at trial that they were unaware that the structuring and reimbursement were punishable as crimes.

The evidence was that Anchin learned of Mr. Snapper's structuring and reimbursement of campaign contributions only as a result of an allegation in the plaintiffs' initial complaint in this action. The firm then retained counsel, and on advice of counsel "self-reported" the probable campaign finance law violations. The defendants thereafter cooperated with federal investigators and supplied documents (including documents concerning Ms. Cornwell's affairs) in response to a federal subpoena.

Under New York law, the self-report was subject to a qualified privilege, and can be the basis for actionable liability only if the defendants made knowingly or recklessly false statements or were motivated solely by malice. See Toker v. Pollak, 376 N.E.2d 163, 168 (N.Y. 1978).

There was no evidence that the information about the structuring and reimbursement of campaign contributions conveyed by the defendants to federal authorities was false. In her own testimony, Ms. Cornwell acknowledged that Mr. Snapper's structuring and reimbursement of the contributions was done at her instance; she denied only that she knew it was criminally wrong. The plaintiffs are left with the contention that the defendants' report to the Justice Department was done out of malice. The sole evidentiary basis for that contention, as to which the plaintiffs bear the burden of proof, <u>Toker</u>, 376 N.E.2d at 166, is that the report was made by the defendants after they had been first fired and then sued by the plaintiffs. That temporal circumstance is not itself a sufficient basis for a finding of malice, especially in light of the evidence that the defendants had a motive to mitigate any punishment that might be imposed on them by initiating a self-report. <u>See</u> 72 Fed. Reg. 16695, 16696 (Apr. 5, 2007). A reasonable jury would not have had a sound evidentiary, as distinguished from speculative, basis for finding that the defendants acted with actual malice. The upshot is that, given the qualified privilege, the report to the Justice Department could not be held to be a breach of fiduciary duty.

The response to the subpoena was absolutely privileged. <u>See</u> <u>Toker</u>, 376 N.E.2d at 166-67. <u>See also</u> <u>Shillitani v. United States</u>, 384 U.S. 364, 370 (1966).

Moreover, under New York law it was not a breach of fiduciary duty for the accounting firm to provide information to authorities without the former client's consent when "authorized or required by law." Rules of N.Y. Bd. of Regents § 29.10(c).

The defendants are entitled to judgment as a matter of law on this claim.

G.     <u>NetJets</u>

The plaintiffs' claim that Mr. Snapper failed to obtain the best possible deal when negotiating the plaintiffs' fractional-ownership contract with NetJets in 2006 is unsupported by

any legally sufficient evidence of damages. The only evidence of damages that the plaintiffs presented was Dr. Gruber's testimony that in 2010, when she negotiated a new contract with NetJets and switched to a smaller plane, the plaintiffs saved $232,000. She also testified that the new contract included perks that the old contract had not included, which she "believed" to be valued at "just over $300,000." This is the kind of "rel[iance] on conjecture or speculation" that does not constitute legally sufficient evidence. Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 39 (1st Cir. 2010) (citations omitted). Any reasonable jury would conclude that at least some of the difference between the contracts is explained by the plaintiffs' decision to downgrade to a smaller plane. Further, the plaintiffs failed to produce any evidence to show the value of the best contract that Mr. Snapper could have negotiated in 2006. Given the dearth of evidence on damages, judgment as a matter of law should enter against the plaintiffs on claims arising out of the negotiation of the 2006 NetJets contract.

> H.   Real Estate Transactions (Renaissance and Fifth Avenue)

The plaintiffs asserted negligence, breach of contract, and breach of fiduciary claims against the defendants for their conduct in connection with the abortive rental of the Renaissance condo and the Fifth Avenue apartment. As to the Renaissance condo, all the events tending to support liability occurred between January and May 2006. With respect to the Fifth Avenue apartment, the plaintiffs' evidence was that Mr. Snapper did not ensure that the apartment would be suitable for Ms. Cornwell's work and made the lease arrangements under false pretenses, forcing Dr. Gruber to pretend to be someone she was not. The plaintiffs asserted that the defendants were liable for the amount spent on rent and brokers' fees for duration of the unsatisfactory lease, which covered the period from May to July 2006. All the events occurred

well earlier than necessary for the claims to be timely within the three year limitation period extending backward from the filing of the complaint in October 2009.

The three year statute of limitations for negligence actions, breach of contract actions, and breach of fiduciary duty actions for monetary relief bars these claims. Again, the invocation of the continuous representation doctrine is not warranted.

The defendants are entitled to judgment as a matter of law on these claims.

I.    Other Claims

The defendants' motion for judgment as a matter of law as to other of the plaintiffs' claims is denied.

**II.    New Trial – Rule 59**

"The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Fed. R. Civ. P. 59(a)(1)(A).

The defendants have submitted a lengthy list of reasons why the grant of a new trial is justified, but one suffices: since the defendants are entitled to judgment as a matter of law on the claims discussed above, and since "the jury's consideration of those claims may have affected verdict," Lattimore v. Polaroid Corp., 99 F.3d 456, 458 (1st Cir. 1996), there is no way to assess what the verdict on the remaining claims properly subject to jury evaluation would have been. See Gillespie v. Sears, Roebuck & Co., 386 F.3d 21, 29-30 (1st Cir. 2004) ("This rule applies not only to general verdicts encompassing multiple causes of action, but to special verdicts where a single verdict question encompasses multiple theories, one of which is defective.").

Here, the verdict makes it impossible to tease out the jury's findings as to individual issues or claims, and a new trial on issues other than those resolved against the plaintiffs by this Order is necessary.

**III.    Conclusion**

For the reasons stated herein, the defendants' Renewed Motion for Judgment as a Matter of Law (dkt. no. 408) is GRANTED in part and DENIED in part, and the defendants' Motion for a New Trial (dkt. no. 409) is GRANTED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

11

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11708-GAO

CORNWELL ENTERTAINMENT, INC., et al.,
Plaintiffs,

v.

ANCHIN, BLOCK & ANCHIN LLP, et al.,
Defendants.

OPINION AND ORDER ON CLAIMS FOR UNFAIR OR DECEPTIVE
ACTS OR PRACTICES AND EQUITABLE FORFEITURE
May 28, 2013

O'TOOLE, D.J.

The jury returned a verdict as to the plaintiffs' claims for negligent performance of professional services (Count I in the Fifth Amended Complaint, dkt. no 77), breach of fiduciary duty (Count II), and breach of contract (Count III). The Court reserved judgment on the plaintiffs' claims under Massachusetts General Laws Chapter 93A (Count VI), the New York Consumer Protection Act and corresponding common law (Count VII), and equitable forfeiture doctrine (Count V).[1] This Order addresses those reserved claims.

**I.    Unfair or Deceptive Acts or Practices under Massachusetts General Laws Chapter 93A**

As noted, the operative complaint pleads claims under both Chapter 93A and the New York consumer protection statute, N.Y. Gen. Bus. Law § 349 (McKinney 2004), but having saddled up two horses, the plaintiffs now ride only one, arguing for a finding in their favor under the Massachusetts statute. The plaintiffs' Chapter 93A claim is for losses in investment accounts,

---

[1] The plaintiffs elected not to proceed on claims for conversion (Count IV) and intentional interference with advantageous relations (Count IX). I granted judgment for the defendants on the defamation claim (Count VIII).

mismanagement of the renovation of the Garfield Road property, causing Ms. Cornwell to miss a book deadline, and the defendants' post-complaint report to the Department of Justice.

The abandonment of the New York claim is prudent not only because it avoids the curious choice of law proposition that the laws of *both* jurisdictions should be invoked to furnish redundant relief for the same acts or omissions, but more substantially because on the facts of this case a claim pressed under the New York statute would fail. What is lacking is evidence that any deceptive or misleading conduct by the defendants was "consumer-oriented" in the necessary sense. Cf. N.Y. Univ. v. Cont'l Ins. Co., 662 N.E.2d 763, 770 (N.Y. 1995) (finding that the plaintiff failed to meet the "threshold requirement of charging conduct that has a broad impact on consumers at large" where "the policy was not a standard policy, but was tailored to meet the purchaser's wishes and requirements."). In order to have a "broad[] impact on consumers at large," the alleged unfair or deceptive act or practice must "have the potential to 'affect similarly situated consumers.'" Vitolo v. Mentor H/S, Inc., 213 Fed. Appx. 16, 17 (2d Cir. 2007) (citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741 (Ct. App. N.Y. 1995)).

The plaintiffs agreed at trial that New York law governed the common law claims concerning the defendants' conduct as to the matters alleged in the complaint. It is inconsistent and illogical for the plaintiffs to now contend that Massachusetts statutory law should also be chosen to apply to those same acts or omissions. Even with respect to reserved matters now being addressed, the plaintiffs argue simultaneously that Chapter 93A's remedies should be available to them and that New York law regarding equitable disgorgement should also be applied. Perhaps this is an occasion for judicial estoppel, but in any event, in light of their

position that New York law applies to all the other claims, they cannot sensibly contend that Massachusetts law also applies, simply because it offers distinctive remedies.

Even if the plaintiffs' position were not inconsistent, however, conventional choice-of-law analysis would yield the same result. In a diversity case, a federal court uses the choice-of-law framework of the forum state, in this case Massachusetts. <u>Lexington Ins. Co. v. Gen. Acc. Ins. Co. of Am.</u>, 338 F.3d 42, 46 (1st Cir. 2003) (citing <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 491 (1941)).

Regarding a Chapter 93A claim, the choice-of-law analysis may depend on whether the claim is analogized to a tort or a contract claim. <u>See</u> <u>Crellin Technologies, Inc. v. Equipmentlease Corp.</u>, 18 F.3d 1, 11 (1st Cir. 1994) ("We hold that, at minimum, when a chapter 93A claim and the requested remedy are highly analogous to a tort claim and remedy, the chapter 93A claim should be considered as a tort for choice-of-law purposes."); <u>Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.</u>, 986 F.2d 607, 609 (1st Cir. 1993) (holding that a Chapter 93A claim may trigger a contractual conflicts analysis where it is essentially an "embroidered" contract claim). The conduct which the plaintiffs believe violates Chapter 93A is a mix of tort claims and contract claims.

For the claims that sound more in contract than tort, it is clear that New York law should apply. The contract at issue in the case was negotiated and executed in New York, and the defendants' performance (or non- or mis-performance) was centered in New York. <u>See</u> Restatement (Second) of Conflict of Laws § 188 (1971).

As to tort-like claims, Massachusetts takes a "functional" approach in assessing what law should apply, analyzing which State has a more significant relationship to the conduct at issue.

<u>Cosme v. Whitin Mach. Works, Inc.</u>, 632 N.E.2d 832, 834 (Mass. 1994). The factors to be considered are those spelled out in the Restatement:

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

<u>Id.</u> at 834 n.3 (quoting Restatement (Second) of Conflict of Laws § 145 (1971)).

Taking those factors in order: First, it may be proper to say that with respect to the claim of mismanagement of the Garfield project the injury occurred where the real estate is located. As to the other claims, however, it is difficult to place in a physical location (that is, give them a "locus" within one State or another) harms that are not essentially physical in nature. To be sure, an "injury" could be characterized for these purposes not as the liability-producing occurrence but rather the impact of that occurrence on a plaintiff. If so, the injury would occur wherever the plaintiff is, and the first and third Restatement factors could be regarded as essentially the same. So, while it may be correct to say that as to the claim about the Garfield property the place of injury was Massachusetts, it seems too strained a project to try to say "where" losses in investment accounts occur, or "where" the opportunity to complete a book on time was lost.

In contrast, the conduct that purportedly caused the injury can be located in a place or places. The conduct alleged here was, put broadly, mismanagement. Any mismanagement occurred where the plaintiffs' affairs were being managed, and that was principally Anchin's New York office. This factor points to resort to New York law.

4

The third Restatement factor, where the parties are located, is a wash, as it commonly is in diversity cases, the plaintiffs centered in one State and the defendants centered in another.

The fourth factor points to New York. Though there were certainly relevant events that occurred outside that State, the parties' relationship was clearly centered in New York City.

In sum, one Restatement factor is neutral, one points to Massachusetts for some, but not all, of the claims, and two point to New York. Point-scoring aside, looked at through a "gestalt" lens, the view is the same. Underlying all of the claims is New York's interest in overseeing the conduct of businesses located within its borders. This case involves alleged misconduct by a New York based accounting firm that occurred primarily in New York, and New York has the more significant interest in the outcome of this case.

That was the belt; here are the suspenders: Even if Massachusetts law should be applied to the claim concerning Garfield property, I would not find as a substantive matter that the defendants' conduct violated Chapter 93A because I would not find that it was unfair or deceptive under that statute. The plaintiffs' claim regarding Garfield centers on the defendants' lack of proper and effective management. While it may have been negligent for Mr. Snapper not to have given more diligent oversight, I would not conclude on the trial evidence that he acted in any unethical or deceptive way with respect to the renovation project. Indeed, the trial testimony showed that the plaintiffs were very aware of the state of the Garfield project and actively involved in decision-making about it. So even if Chapter 93A were to apply to this claim, I would find that the defendants did not violate that statute in connection with the Garfield property.

## II.   Equitable Forfeiture

The plaintiffs plead that "[d]efendants, as faithless fiduciaries, have forfeited the right to any compensation from CEI or Ms. Cornwell and are required to make restitution to CEI and Ms. Cornwell of all sums paid as compensation *during the period of their disloyalty*." (Am. Compl. ¶ 56 (dkt. no. 77) (emphasis added).)

The parties agree that forfeiture is to be limited to "the period of disloyalty." Astra USA, Inc. v. Bildman, 455 Mass. 116, 130 (2009) (applying New York forfeiture law); see also Design Strategy, Inc. v. Davis, 469 F.3d 284, 301-02 (2d Cir. 2006) (affirming forfeiture of salary earned during the "period of disloyalty," a thirty-day period in thirteen years of employment). By claiming entitlement to all fees paid since they first engaged Anchin, the plaintiffs implicitly contend that the period of disloyalty covers the entire business relationship. In support of this position, the plaintiffs point exclusively to the jury's finding that the defendants breached a fiduciary duty, proximately causing damages to the plaintiffs in the amount of $22,405,400.

Both sides consented to the form of the general verdict. From the general verdict it is impossible to identify what the jury thought the period of disloyalty was so that an appropriate amount of forfeiture could be calculated. Under the circumstances, I cannot make a reasoned determination of the period of disloyalty, unless it was the entire period of the relationship. To the extent the jury may have intended that, it is plausible that their damage award has already included the disgorgement of fees, because the jury awarded damages exceeding the sum argued by the plaintiffs, even as augmented by all fees paid. If that was the case, no further award would be appropriate. Even if, alternatively, I were to find a narrower period of disloyalty (a finding that might be foreclosed by a broader jury finding), in light of the jury's punitive damage award,

as well as the size of the compensatory award, I would not regard it as equitable to make an additional disgorgement order. For these reasons, no forfeiture is ordered.

**III.      Conclusion**

In sum, Count VI (Mass. Gen. Laws Ch. 93A) is inapplicable, and Count VII (New York Consumer Protection Act) fails on the merits. An award under Count V (equitable forfeiture) is unnecessary and unwarranted, and I decline to order one. The plaintiff's Motion for Attorney Fees (dkt. no. 356) is DENIED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge